UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------------- x

ENBAR OZERI

                               Plaintiff,

            -against-

THE CITY OF NEW YORK;   JOHN DOE POLICE
OFFICERS ##1-20

                         Defendants.
----------------------------------------------------------------------- x

**COMPLAINT AND
JURY DEMAND**


ECF CASE

## <u>INTRODUCTION</u>

1.     The New York City Police Department ("NYPD") does not police protests in an unbiased manner.  Rather, the Department makes security and enforcement decisions based on the expressed viewpoints of protesters (and counter-protesters).

2.     Protests promoting viewpoints favored by the NYPD are policed with forbearance.  Officers protect the protesters, and do not make arrests for unlawful behavior, while peaceful counter-protesters are met with violence and arrests.

3.     Protests promoting viewpoints <u>dis</u>favored by the NYPD are not protected by officers. They are often met with violence and arrests with excessive force.  Violent counter-protesters to disfavored protests are given free rein to harass and assault protesters.

4.     The Plaintiff, Enbar Ozeri, was attending a small protest promoting a point of view disfavored by the NYPD and the City's leadership, namely, a pro-Palestinian rights point of view.  NYPD's practice and tacit policy of policing protests in a way that favors certain viewpoints and disfavors others caused serious injury to Ms. Ozeri.

5.     The police officers' actions and inactions were negligent and deliberately indifferent to Ms. Ozeri's safety and violated constitutional rights to free speech, freedom of

assembly, due process and equal protection.

## JURISDICTION

6.     This action is brought pursuant to 28 USC §1331 and 42 USC §1983.  Supplemental jurisdiction of state law claims is asserted.

7.     Venue is laid within the United States District Court for the Eastern District of New York in that the claim occurred within the boundaries of the Eastern District of New York.

## PARTIES

8.     Plaintiff Enbar Ozeri is a resident of New York City.  She is a citizen of both the United States and Israel.  She is a social worker and is active in anti-Zionist and pro-Palestinian movements.

9.     Defendant the City of New York is a municipal corporation organized under the laws of the State of New York.  The New York City Police Department ("NYPD") is an agency of the City of New York.

10.     Defendants John Doe ##1-20  were at all times relevant members of the NYPD and were present and played a role in causing Plaintiff's injury and violation of her rights.  They are sued in their individual and capacities.

11.     At all times here mentioned Defendants were acting under color of state law, to wit, under color of the statutes, ordinances, regulations, policies, customs and usages of the City and State of New York.

## FACTUAL ALLEGATIONS

### ITAMAR BEN-GVIR SPEAKS AT CHABAD HQ

12.     Chabad-Lubavitch is a global Orthodox Hasidic movement within the Jewish religion.  Its world headquarters is located at 770 Eastern Parkway, Brooklyn, NY.

13.     On April 24, 2025, the Chabad Lubavitch World Headquarters hosted Itamar Ben-Gvir where he was expected to speak to a group of supporters.  The headquarters is located at 770 Eastern Parkway, in the Crown Heights section of Brooklyn, New York.

14.     Mr. Ben-Gvir is a notorious supporter of racist terrorist attacks against Palestinians and people of the Islamic faith.  He is a supporter and follower of the late Rabbi Meir Kahane, himself a convicted terrorist.  Kahane and his political party were sanctioned by the Israeli Knesset as a racist (anti-Arab) organization.  Ben-Gvir described Kahane as a "saint".

15.     Mr. Ben-Gvir is the leader of the Otzma Yehudit ("Jewish Power") party, which is the ideological successor political party to Kahane's political party, which was ultimately banned in Israel.

16.     Jewish Power is widely described in the international press as an extremist, racist, and Jewish Supremacist political party. The Times of Israel, the country's centrist, largest English language newspaper, stated that Ben-Gvir's party's policies are akin to the neo-Nazi and fascist parties in Europe.

17.     Mr. Ben-Gvir himself has been convicted multiple times of supporting terrorism and racism (all directed against Arab people).

18.     Nevertheless, Prime Minister Benyamin Netanyahu invited him into a governing coalition in 2022 and named him Minister of National Security of Israel.

19.     Even the American-Israel Political Action Committee ("AIPAC"), which generally supports Israeli right-wing policies, implored Netanyahu not to enter a coalition with Ben-Gvir.

20.     Last year, Mr. Ben-Gvir called for the ethnic cleansing of Gaza by encouraging Palestinians to "voluntarily" leave the region.  He later advocated withholding aid, including food, to encourage them to leave "voluntarily".

21.     With tensions in New York City high over the Hamas October 7 attack on Israel and the ongoing Gaza War, the Chabad Lubavitch religious organization hosted the divisive, racist Itamar Ben-Gvir to speak at its world headquarters.

22.     Notably, the Chabad Headquarters and community was the epicenter of the "Crown Heights riots" in 1991. A young Orthodox Jewish man from Australia studying in New York, Yankel Rosenbaum, was stabbed and later died of his wounds. Lemrick Nelson, a Black man, was identified and immediately arrested for the crime.

### THE PROTEST

23.     A small group gathered near the Chabad HQ to protest against Ben-Gvir.

24.     Ms. Ozeri took the subway to the protest and walked to where the group had gathered.

25.     The police had set up barricades for where the people could protest.  They were not to protest outside of that area.  The protesters complied during the time Ms. Ozeri was present at the protest.  Upon information and belief, the protesters complied throughout the duration of the protest.

26.     Ms. Ozeri participated in the protest by chanting slogans against Ben-Gvir and the Israeli government's war on Gaza and in favor of Palestinian rights.  Ms. Ozeri and the protesters remained peaceful throughout.

27.     Counter-protesters who appeared to be connected to Chabad and/or the Ben-Gvir event began to counter protest. They significantly outnumbered the protesters. Yet, they were not similarly penned in by police and were allowed to freely move about.

28.     The counter protesters approached the protesters making vile threats and eventually began to assault the protesters by throwing things at the protesters like eggs, food containers and

bottles filled with liquid. The police did nothing in response to stop the counter-protesters from approaching or assaulting the protesters.

29. The protest continued for approximately 30-45 minutes while counter-protesters assaulted the protesters; the protesters chanted and yelled responses at the counter-protesters but remained peaceful. Meanwhile the police stood by doing nothing to protect the protesters, implicitly encouraging the protesters.

30. The police had told the protesters to remain in the barricaded area while they were being assaulted. By contrast, the counter-protesters were allowed to roam and attack the protesters.

31. Under assault and without police protection, the protesters told the police that they wanted to end the protest, leave the barricaded area and go to the nearest subway station entrance which was directly across the street. The police officers refused to let them go to the nearest subway station entrance.

32. Instead, police forced them to walk a gauntlet of assaults. They were made to walk down Eastern Parkway across and parallel with the headquarters building where yelling, assaultive counter-protesters were amassed. The walk to the intended subway entrance was considerably longer than if they were simply allowed to leave by the nearest subway entrance.

33. During the walk, the protesters continued to be pelted with hard objects while the police, still present, did nothing to stop it.

34. Ms. Ozeri was struck on the forehead with an object thrown by a counter-protester. She was bleeding profusely from her forehead. Protesters screamed for help while counter-protesters continued their attack. Protesters surrounded her to protect her from the counter-protesting mob. The police stood by, doing nothing to stop the mob or to protect Ms. Ozeri.

35. Ms. Ozeri was attended to by a civilian medic. Though a Hatzalah ambulance – an

ambulance service dedicated to serving communities with concentrations of Orthodox Jewish people – was nearby, it did not come to help. Eventually, a city EMS ambulance responded to the scene.

36.    Mr. Ozeri was forced to walk a distance to the ambulance, again without the assistance of police officers despite their presence in the immediate vicinity. She was walked to the ambulance by the civilian medic who came to the protest.

37.    Police officers eventually came to the ambulance. They were mostly just ordering who was not allowed to travel with Ms. Ozeri to the hospital.

38.    Ms. Ozeri was taken to the hospital where she received stitches to her forehead. To this day a scar reminds her of that evening.

39.    To date, despite extensive video recording of the crowd and many witnesses, upon information and belief NYPD has made no arrests in connection with the assault on Ms. Ozeri or any of the other protesters and bystanders. She was contacted once by phone by an NYPD officer a few days after the incident and never heard from NYPD again. Upon information and belief, no serious investigation of the crime committed against Ms. Ozeri or any of the other protesters has been undertaken by NYPD and no counter-protester was arrested.

40.    Ms. Ozeri's injuries are an utterly foreseeable consequence of the Defendant police officers' actions and inactions in favor of the counter-protesters and their viewpoint. It was clearly foreseeable that the counter-protesters, who were being allowed to freely assault the protesters while protesting, would continue their assault as the protesters tried to leave. And it was clearly foreseeable that injury was far more likely to occur when Defendant police officers refused to allow the protesters to exit the area in the shortest way possible and instead forced them on a much longer march past the mob.

## NYPD POLICES PROTESTS BASED ON VIEWPOINT

41.     The City of New York, through its agency the NYPD, has a tacit policy and practice of unequal protest policing based on the viewpoint of protesters.  In the instant case, Ms. Ozeri alleges that police permitted and even encouraged counter-protesters to assault her and other Pro-Palestine protesters *because* of their point of view regarding Israel and the Gaza War.

## Biased Point of View Training

42.     Police officers receive viewpoint biased training in policing protest.  For example, the NYPD Strategic Response Group ("SRG") is a division of NYPD officers dedicated to rapid response to protests.  The SRG instruction manual[1] advises these officers that there are "two different types of crowds"; non-violent/compliant and violent/non-compliant.

43.     The instruction manual gives examples of the "violent/non-compliant" crowds, citing "Crown Heights (1991), Occupy Wall Street, BLM Movement, [and] Anti-Trump demonstrations."  Each of these protests supported left-wing causes.[2]  Notably left out of the list of examples are violent/non-compliant right-wing demonstrations that have taken place in New York City.

44.     The SRG instruction manual was drafted prior to the outbreak of Israel/Palestine protests starting in 2023.  However, other training has singled out Pro-Palestine demonstrators as particularly dangerous in contrast to the reality of those protests.

45.     For example, in January 2025, the Combat Anti-Semitism Movement ("CAM") –

---

[1] The manual indicates that it was published in 2018 and revised and reviewed in 2020.
[2] Occupy Wall Street was a movement in favor of reducing income inequality. BLM stands for "Black Lives Matter".  These were protests against disparate treatment between Black and white people in policing, criminal justice and other societal institutions. Anti-Trump demonstrations protest right-wing Republican President Donald Trump and his Make America Great Again movement." The events that took place in Crown Heights in 1991 were more spontaneous reaction to the killing of a black child by a car driven by Lubavitch-Chabad driver and was, at least in part, motivated by the disparate and more favorable treatment accorded to that Hasidic community in Crown Heights than the Black community.

a private pro-Israel anti-Palestinian rights non-profit organization - held a training for NYPD's top brass. NYPD Commissioner Jessica Tisch gave opening remarks. In the organization's Facebook page, they say: "The training focused on identifying the various forms of antisemitic attacks, understanding radical ideologies fueling these incidents, and equipping law enforcement with the tools to better protect the community."

46.     Preventing antisemitic attacks is certainly a laudable goal. However, it appears that the "training" was much less about preventing violence against Jewish people, instead encouraging police to see protesters with whom they disagree as particularly "dangerous."

47.     On September 8, 2025, CAM held a training session for 300 police officers. NYC Deputy Mayor for Public Safety Kaz Daughtry attended and spoke at the event. The police officers there for the training were told by CAM's Interfaith Outreach Coordinator that "red hands" and "globalize the intifada" are "very clear" calls for attacks on Jews and supporters of Israel. [3] These are political words and actions protected by the core of the First Amendment.

48.     Upon information and belief, the trainings delve further into biased anti-Arab and anti-Palestine propaganda, providing a political training to members of the NYPD to use in their work of policing protests. They forge an understanding in police that Pro-Palestine protesters are antisemitic, extremist and dangerous. For instance, upon information and belief, CAM's trainings have included the following political and racist propaganda:[5]

> a. Describing Islam as a "political ideology where Islamic law overrides the law of man."
>
> b. Stating "Jihadism is a subset of Islam that uses violence to impose Islamic law."

---

[3] Taken on October 2, 2025, from https://combatantisemitism.org/cam-news/cam-law-enforcement-training-program-offers-nypd-officers-lessons-on-identifying-antisemitic-and-extremist-threats/

[5] The allegations that follow appear in a complaint filed in the Southern District of New York, Makkawi et al., v. The City of New York et al., 25-cv-6321 (DEH).

c.  Describing Pro-Palestine supporters as "young, bored and looking for purpose" leading them to extremism.

d.  Describing Pro-Palestine student groups as extremist.

e.  Describing the words "from the river to the sea Palestine will be free" as "antisemitic."

f.  Describes the keffiyeh, a traditional Palestinian headdress, as a symbol of "antisemitism."

g.  Describes the symbol of the watermelon, meant to depict the flag of Palestine where the flag is banned, as "antisemitic".

h.  States the slogan "all eyes on Rafah" – a call for people to not look away from Palestinian suffering – as antisemitic.

49.     The training police officers receive in these sessions and their manuals, as well as likely other sources and direct orders, manifests in biased policing during protests and more importantly, causes to see all Pro-Palestine protesters as a security threat.  Of course, the reality is different.  Multiple studies and government reports show that the dominant threat to the security and safety of Jewish people comes not from Pro-Palestine or proponents of other left-wing causes, but from right-wing extremism.  Despite this reality, these sessions train police officers to police Pro-Palestine protesters with greater violence and to allow harm to come to them. Upon information and belief, thousands of NYPD officers have received this training.  The assault on Ms. Ozeri are the entirely predictable outcome of these trainings.[6]

50.     The trainings and manuals do not increase the safety of Jewish people.  Rather they serve to demonize and squelch legitimate, First Amendment protected speech and actually cause harm to the many Jewish people who protest for Palestinian rights, including  Ms. Ozeri.

51.     Furthermore, regardless of whether people agree or disagree with CAM's

---

[6] *See https://jewishcurrents.org/training-nypd-keffiyeh-watermelon-antisemitism-israel-palestine, taken on October 3, 2025.*

characterizations of Pro-Palestinian words, symbols and actions, these NYPD required trainings unconstitutionally and harmfully promote and/or oppose political viewpoints for police officers to use in their governmental activity of policing protests.

**Biased Policing of Protests in Practice**

52.     On October 21, 2023, May 11, 2024, May 18, 2024, August 14, 2024, February 18, 2025, April 28, 2025, and May 8, 2025, pro-Palestine protesters were violently assaulted and falsely arrested by NYPD police officers.  In an ample warning of  what was about to occur on April 24, 2025, NYPD allowed counter-protesters to also attack the protesters at the February 18, 2025 protest.  For brevity and attribution purposes, the detailed allegations in connection with this incident are detailed in a Complaint filed in S.D.N.Y., Makkawi et al., v. City of New York, et al., 25-cv-6231 (DEH) at paragraphs 65-138 and attached here.

53.     Yet, in the case of right-wing supporting protesters and counter-protesters, NYPD takes a permissive approach, allowing illegal behavior to go unredressed.  Many older New Yorkers remember the Patrolman's Benevolent Association riot of 1992, when thousands of police officers gathered to protest expanded powers of the Civilian Complaint Review Board and engaged in racist and violent behavior.  The on-duty officers policing the riot refused to enforce or in any way prevent the illegal behavior.

54.     In each of the below protests NYPD officers were present.[7]

55.     On October 12, 2018, members of the right-wing extremist group the Proud Boys violently assaulted an anti-fascist protester, kicking and punching him while he was on the ground while screaming "faggot" at him.  At least three SRG police officers stood by and watched without intervening.  When the Proud Boys began walking away from the scene, the police did not follow

---

[7] These incidents are discussed in greater detail in the attached Makkawi v. City of New York, 25-cv-6321.

or even attempt to question them. The next morning, police told reporters there was no investigation into the incident. Only when the video went viral and there was public outcry did NYPD start an investigation. It was later discovered that the Proud Boy founder who was at the scene earlier in the evening brandished an illegal weapon – a sword – on the street in front of police without any intervention or repercussion.[8]  It is little wonder that the Proud Boys founder stated after the incidents "I have a lot of support in the NYPD."

56.     On July 13, 2020, protesters at a Blue Lives Matter[9] protest assaulted and screamed bigoted obscenities at counter-protesters.  One protester punched a woman in the face in plain view of the officers.  No protesters were arrested, but two counter protesters were arrested.

57.     On October 7 and 8, 2020, hundreds of members of the ultra-orthodox Jewish community gathered to protest coronavirus restrictions.  Protesters set fires, chased away NYC Sheriff's deputies and attacked a photojournalist.  A counter-protester was attacked by the crowd and hit with rocks.  No one was arrested.

58.     On October 25, 2020, "Jews for Trump" conducted a rolling caravan and engaged in acts of disorder in New York City streets throughout.  No arrests were made.

59.     On December 2, 2020, protesters gathered to protest covid restrictions on Staten Island.  They blocked traffic and violated Covid public health rules, but no arrests were made.

60.     Red Rose Rescue, a militant anti-abortion group, routinely march and protest in New York City without being subjected to the arrests and uses of excessive force that left-wing protests, such as Pro-Palestine protests, are subjected to and in fact are protected from counter-protesters.

---

[8] https://gothamist.com/news/nypd-accused-of-incredibly-deferential-treatment-of-proud-boys-following-beatings-caught-on-video
[9] Blue Lives Matter was created as a counter movement and to oppose the Black Lives Matter movement.

61.     The above are just examples of the differential treatment accorded to left-wing and right-wing protesters.  Police officers will stand by and watch right-wing protesters and counter-protesters assault left-wing protesters without intervention, which not only violates the constitutional rights of left-wing protesters such as Ms. Ozeri, but actually *causes* these attacks and resulting physical injuries by emboldening right-wing attackers with the knowledge that they are supported by onlooking NYPD officers.

62.     Like the Proud Boys, anti-Palestinian rights protesters-cum-attackers know they "have a lot of support inside NYPD".

63.     At all times during the events described above, the Defendant police officers were acting under color of law and within the scope of their employment. The Defendant officers assisted each other in performing the various actions described and lent their physical presence and support and the authority of their office to each other during said events.

64.     At all times during the events described above, the Defendant police officers were engaged in a joint venture violating Plaintiff's rights.  The individual officers assisted each other in performing the various actions described and lent their physical presence and support and the authority of their office to each other during said events.

65.     During all the events above described, Defendants acted maliciously and with intent to cause injury and harm to Plaintiff and her fellow protesters.

66.     Plaintiff filed written Notice of Claim with the New York City Office of the Comptroller.  Over 30 days have elapsed since the filing of that notice, and this matter has not been settled or otherwise disposed of.

67.     This action falls within one or more of the exceptions set forth in CPLR §1602.

## **DAMAGES**

68.   As a direct and proximate result of the acts of defendants, the Plaintiff Enbar Ozeri suffered the following injuries and damages:

a.   Violation of her freedom of speech and assembly rights under the First Amendment of the United States

b.   Violation of her right to Due Process of Law under the Fourteenth Amendment to the United States Constitution;

c.   Violation of her equal protection right under the Fourteenth Amendment to the United States Constitution;

d.   Physical pain and suffering;

e.   Emotional trauma and suffering, including fear, emotional distress, frustration, fright, horror, grief, depression, loss of sleep, and increased levels of anxiety; and

f.   Loss of income.

**FIRST CAUSE OF ACTION – 42 U.S.C. § 1983**
**VIOLATION OF FIRST AMENDMENT RIGHT TO FREE SPEECH AND ASSOCIATION**
(AS TO ALL DEFENDANTS)

69.   The above paragraphs are here incorporated by reference.

70.   Plaintiff's rights to free speech, expression and assembly were violated due to the acts and omissions alleged herein.

71.   By being present, giving Plaintiff and the other protesters instructions of where to stand, and allowing counter-protesters to harass and assault Plaintiff and her fellow protesters, the police affirmatively gave counter-protesters a "heckler's veto", forcing the protesters to leave and violating the protesters First Amendment right to freedom of speech, expression and assembly.

72.   As described above, NYPD is trained and practices in viewpoint discrimination in

policing protests.  Here, Defendants actions and omissions in demanding that protesters stand in a certain area and allowing counter protesters to harass and assault them was discriminatory against the protesters point of view, to wit, Palestinian rights.

73.    Even if the policing was not due to Plaintiff's viewpoint, it still amounted to an unconstitutional abridgement of her rights under the First Amendment.

74.    Plaintiff suffered damages due to Defendants' violation of her rights.

## SECOND CAUSE OF ACTION -- 42 U.S.C. § 1983
## VIOLATION OF FOURTEENTH AMENDMENT DUE PROCESS RIGHT TO BE FREE FROM UNJUSTIFIED INTRUSION OF PERSONAL SECURITY
### (AS TO ALL DEFENDANTS)

75.    The above paragraphs are here incorporated by reference.

76.    The Defendant police officers formed a special relationship with the protesters and thereby had a duty to protect them.

77.    By their presence implying authority, their demands of the protesters, and doing nothing to quell the violence of the counter-protesters against the Protesters, The Defendant police officers tacitly encouraged the attacks on protesters, including Plaintiff.

78.    The Defendant police officers were deliberately indifferent to the personal security of the protesters, including Plaintiff.

79.    The acts and omissions of the Defendant police officers would shock the conscience of any reasonable observer.

80.    Plaintiff suffered damages due to Defendants' violation of her rights.

## THIRD CAUSE OF ACTION -- 42 U.S.C. § 1983
## VIOLATION OF FOURTEENTH AMENDMENT RIGHT TO EQUAL PROTECTION
### (AS TO ALL DEFENDANTS)

81.    The above paragraphs are here incorporated by reference.

82.     The Defendants' training and practice of policing Pro-Palestine protests in an unsafe, unconstitutional and detrimental manner caused the Defendant police officers to in fact police the above-described protest in such a manner.

83.     The Defendant police officers' failure to police the protest in an equal manner to protests that are viewed as viewpoint favorable to the Defendants caused the Plaintiff to suffer constitutional and physical injury.

84.     Defendants acted with malicious intent, purposefulness and/or deliberate indifference and are liable to plaintiff under 42 U.S.C. §1983.

### FOURTH CAUSE OF ACTION – COMMON LAW NEGLIGENCE
(AS TO ALL DEFENDANT POLICE OFFICERS)

85.      The above paragraphs are here incorporated by reference.

86.     Defendant police officers owed a duty of care to Plaintiff.

87.     Defendant police officers breached that duty when they failed to protect Plaintiff from the obviously foreseeable and repeated actions of her attackers while owing her a duty of care and protection.

88.     The negligence, gross negligence and/or deliberate indifference of Defendant police officers proximately caused the injuries Plaintiff suffered.

89.     The Plaintiff was physically and emotionally injured and has been damaged by Defendants' wrongful acts.

### FIFTH CAUSE OF ACTION -- 42 U.S.C. § 1983
### MUNICIPAL LIABILITY
(AS TO DEFENDANT THE CITY OF NEW YORK)

90.     The above paragraphs are here incorporated by reference.

91.     All the acts and omissions of the named and unnamed individual defendants

described above were carried out pursuant to policies and practices of the City of New York, which were in existence at the time of the conduct alleged herein, and were engaged in with the full knowledge, consent, and cooperation and under the supervisory authority of the City.

92.     Defendant the City of New York, by their policy-making and decision-making agents, servants and employees, authorized, sanctioned and/or ratified the individual defendants' wrongful acts; and/or failed to prevent or stop those acts; and/or allowed or encouraged those acts to continue.

93.     The acts complained of were carried out by the aforementioned individual Defendants in their capacities as police officers and officials pursuant to customs, policies, usages, practices, procedures and rules of Defendant City of New York.

94.     The aforementioned customs, practices, procedures, and rules of Defendant City of New York include, but are not limited to, the unconstitutional practices of policing protests based on whether the City favors or disfavors the viewpoint of said protests, causing the violation of constitutional rights and physical and emotional injuries to the protesters expressing disfavored viewpoints.

95.     The policies, practices, customs, and usages were a direct and proximate cause of the unconstitutional conduct alleged herein, causing injury and damage in violation of Plaintiff's constitutional rights as guaranteed under 42 U.S.C. § 1983 and the United States Constitution, including its First and Fourteenth Amendments.

96.     As a result of the foregoing, the Plaintiff suffered the injuries and damages alleged herein.

## SIXTH CAUSE OF ACTION
## VIOLATION OF STATE CONSTITUTIONAL RIGHTS
### (AS TO ALL DEFENDANTS)

97.     The above paragraphs are here incorporated by reference.

98.     Defendants, acting under color of law and in the scope of their employment, violated Plaintiff's rights pursuant to Article 1, §§ 8, 9, and 11 of the New York State Constitution.

99.     A damages remedy is necessary to effectuate the objectives of the aforementioned sections of the State Constitution and to ensure Plaintiff's full realization of said rights.

100.    The acts and omissions of the Defendants were intentional, malicious and/or reckless, and were of such a nature that punitive damages should be imposed against them.

<u>**SEVENTH CAUSE OF ACTION**</u>
<u>**RESPONDEAT SUPERIOR**</u>
(AS TO CITY OF NEW YORK)

101.    The above paragraphs are here incorporated by reference.

102.    Defendants' negligent and deliberate acts were undertaken within the scope of their employment by Defendant City of New York, and in furtherance of the Defendant City of New York's interest.

103.    As a result of Defendants' negligent, grossly negligent and deliberately indifferent conduct in the course of their employment and in furtherance of the business of defendant City of New York, plaintiff was damaged.

WHEREFORE, Plaintiff demands judgment against the Defendants, jointly and severally, as follows:

A.     In favor of Plaintiff in an amount to be determined by a jury for each of Plaintiff's causes of action;

B.     Awarding Plaintiff punitive damages in an amount to be determined by a jury;

C.     Awarding Plaintiff reasonable attorneys' fees, costs and disbursements of this

action; and

    D.    Granting such other and further relief as this Court deems just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury.

DATED:    New York, New York
            November 20, 2025

                    Yours, etc.,

                    By:    *Leo Glickman*

                    Leo Glickman (LG3644)
                    Stoll, Glickman & Bellina, LLP
                    5030 Broadway, Ste. 652
                    New York, NY 10034
                    (718) 852-3710
                    lglickman@stollglickman.com

TO:    Defendants