**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------- X

MONÉ MAKKAWI, ROHAAN GILL, LOAY ELASMAR, MIGUEL FIGUEROA, AHMED ELSAYED, ARIB HASAN, CARLA TEJADA, BENJAMIN WILSON, ETHAN WRIGHT, MALIK SALTI, and BRYAN VIVAS, *on behalf of themselves and others similarly situated,*

                                        Plaintiffs,

- against -

THE CITY OF NEW YORK; NEW YORK CITY POLICE DEPARTMENT ("NYPD") SERGEANT JOEL A. MOTTOLA; NYPD DEPUTY CHIEF TIMOTHY J. BEAUDETTE; NYPD OFFICER HOWARD THORNTON; NYPD LIEUTENANT MICHAEL BUTLER; SERGEANT TALHA AHMAD; NYPD OFFICER OMAR DELAROSA; NYPD DEPUTY CHIEF JESSE LANCE; NYPD DETECTIVE BRIAN GREIG; NYPD SERGEANT ANDONIOS CONSTANTATOS; NYPD OFFICER JOSEPH CUNNINGHAM; ASSISTANT CHIEF JAMES MCCARTHY; NYPD OFFICER STEVEN LI; NYPD OFFICER JOAHAN GOMEZ; NYPD LIEUTENANT RICARDO LAWRENCE; NYPD OFFICER HIRAM VELEZ; NYPD MEMBER AHEISHA GRANTAND; AND NYPD JOHN OR JANE MEMBER DOES 1-25;

                                        Defendants.

-------------------------------------------------------------------- X

**Case No. 25-cv-06321 (DEH)**

**FIRST AMENDED CLASS ACTION COMPLAINT**

**JURY DEMAND**

        Plaintiffs MONÉ MAKKAWI, ROHAAN GILL, LOAY ELASMAR, MIGUEL

FIGUEROA, AHMED ELSAYED, ARIB HASAN, CARLA TEJADA, BENJAMIN WILSON,

ETHAN WRIGHT, MALIK SALTI, and BRYAN VIVAS (collectively referred to herein as

"Plaintiffs"), on behalf of themselves and others similarly situated, by and through their attorneys,

Cohen&Green PLLC, Gideon Orion Oliver Esq., Massimi Law PLLC, The Aboushi Law Firm

PLLC, Beldock Levine & Hoffman LLP, The Fu Firm PLLC, and Gibson Law Firm PLLC, hereby file this First Amended Complaint and seek class certification as representatives of a plaintiff class and against defendants pursuant to Rule 23 of the Federal Rules of Civil Procedure.

## PRELIMINARY STATEMENT

1.    Plaintiffs and those similarly situated are individuals so outraged by the ongoing genocide of Palestinians by Israel[1][2][3] that they have taken to the streets of New York City to exercise their First Amendment rights to speech, assemble, and peacefully protest.

2.    Since October 2023, Israel has conducted a relentless bombing campaign and ground invasion of the besieged Gaza strip, targeting schools, hospitals, homes, and shelters.

3.    Israel has killed hundreds of thousands of Gazans, approximately sixty percent of whom are women, children, and the elderly.[4]

4.    Israel has enforced an almost complete blockade of all of food, fuel, clean water, and life-saving aid—a measure that international organizations have repeatedly warned would be catastrophic and lead to famine.[5]

5.    Because of Israel's repeated targeting of civilian infrastructure, by December 2024, Gaza had "highest number of child amputees per capita in the world."[6]

---

[1] AMNESTY INT'L, *'You Feel Like You Are Subhuman': Israel's Genocide Against Palestinians in Gaza* (2024), https://www.amnesty.org/en/latest/news/2024/12/amnesty-international-concludes-israel-is-committing-genocide-against-palestinians-in-gaza/.

[2] B'TSELEM, *Our Genocide* (2025), https://www.btselem.org/sites/default/files/publications/202507_our_genocide_eng.pdf

[3] PHYSICIANS FOR HUMAN RIGHTS-ISRAEL, *Destruction of Conditions of Life: A Health Analysis of the Gaza Genocide* (2025), https://www.phr.org.il/wp-content/uploads/2025/07/Genocide-in-Gaza-PHRI-English.pdf

[4] Rasha Khatib, Martin McKee, & Salim Yusuf, *Counting the Dead in Gaza: Difficult but Essential,* 404 THE LANCET 10449, 237-238 (2024)

[5] PHYSICIANS FOR HUMAN RIGHTS-ISRAEL, *supra* n. 3, at 5-6.

[6] *Gaza: 'Sickening normalisation' of Suffering, Amid Attacks on People and Aid Convoys*, UN News (Dec. 13, 2024), https://news.un.org/en/story/2024/12/1158176

6.    As a result of Israeli attacks on Gaza's health care facilities, Israel's killing and detention of over 1,800 healthcare workers, and its blockade of medical supplies, Gaza's health care system has been "systematically dismantled."[7]

7.    Most of the surviving population of Gaza has been displaced multiple times and now live in overcrowded tent cities and UN emergency shelters, which lack critical infrastructure and basic services, raising the risk of disease, starvation, and malnutrition.

8.    Gaza's water and sanitation services have been rendered almost entirely defunct.

9.    As early as January 2024, the International Court of Justice ruled that Israel is, at least plausibly, committing genocide against the Palestinian people in Gaza.

10.    In November 2024, the International Court of Justice issued arrest warrants for Israeli Prime Minister Benjamin Netanyahu and former Minister of Defense Yoav Gallant.[8]

11.    Yet, the US government has continued to financially, militarily, and politically support Israel's genocide in Gaza.

12.    From October 2023 to September 2024 alone, the United States approved legislation providing at least $17.9 billion in direct military aid to Israel[9], along with $20 billion in arms sales.[10]

13.    People across the world, including New Yorkers, and people of all faiths and dispositions, have witnessed the atrocities in Gaza unfold on their screens.

---

[7] Physicians for Human Rights-Israel, *supra* n. 2, at 5.

[8] "ICC issues arrest warrants for Netanyahu, Gallant and Hamas commander," UN News: Law and Crime Prevention, Nov. 21, 2024, available at https://news.un.org/en/story/2024/11/1157286

[9] Linda J. Bilmes, William D. Hartung, and Stephen Semler, *United States Spending on Israel's Military Operations and Related U.S. Operations in the Region, October 7, 2023-September 30, 2024,* Watson Institute for International & Publix Affairs, Brown University: Costs of War (2024), https://watson.brown.edu/costsofwar/files/cow/imce/papers/2023/2024/Costs%20of%20War_US%20Support%20Since%20Oct%207%20FINAL%20v2.pdf; *See also* Ellen Knickmeyer, "US spends a record $17.9 billion on military aid to Israel since last Oct. 7," Associated Press, Oct. 7, 2024, available at https://apnews.com/article/israel-hamas-war-us-military-spending-8e6e5033f7a1334bf6e35f86e7040e14;

[10] *Id.*

14. These people, including Plaintiffs and similarly situated individuals, understand this genocide to be, as UN Secretary General Antonio Guterres has said: "a test of our shared humanity, a test we cannot afford to fail."

15. Since October 2023, protests erupted around the world, including in New York City, demanding an end to the genocide in Gaza, an end to U.S. funding for military aid to Israel, and full divestment of all universities from funds supporting Israel.

16. The New York City Police Department ("NYPD") has responded with aggressive tactics aimed at targeting the constitutional rights of individuals protesting on behalf of Palestinian human rights, including, *inter alia*, trapping protestors into spaces where they could not escape, beating protestors with batons and fists, throwing protestors to the ground, using pepper spray indiscriminately, and ultimately arresting many of the protestors without lawful justification and without fair warning. All of these actions were without lawful justification and done in an effort to silence those speaking out against the ongoing genocide in Gaza.

17. Protestors have been physically restrained with flex-cuffs in such a manner that caused them unnecessary pain and suffering and, in some cases, possible serious and long-term nerve damage.

18. Protestors have been subjected to lengthy and unnecessary arrest processing.

19. Defendants used these tactics to impede constitutionally protected First Amendment activities, to conduct mass arrests without probable cause, and to deter those arrested and beaten, and others, from exercising their First Amendment rights to speak up on behalf of Palestinian human rights.

20. The NYPD's behavior, organized for the purpose of suppressing Plaintiffs' speech during protests in support of Palestinian human rights, including, but not limited to, speech

condemning the ongoing genocide committed by the Israeli government in Gaza (call these, for short, the "Palestine Protests") has been personally directed and/or permitted by the leadership of the City and NYPD, such as Mayor Eric Adams, NYPD Chief of Patrol John Chell, and Deputy Commissioner Kaz Daughtry.

21.     As discussed below, members of the NYPD received training that is Islamophobic, Anti-Arab, and anti-Palestinian under the pretext of combating antisemitism.

22.     Through this training, members of the NYPD are taught that symbols of Palestinian and Arab identity, such as Kuffiyehs and watermelons, are hateful, antisemitic, and that they should police and prosecute them accordingly.[11]

23.     By contrast, these same NYPD members have responded to other protests and protestors—including counter-protestors at the Palestine Protests—without using the same tactics employed against those who protested in support of Palestine and in opposition to Israel's genocide of Gaza and violence in the West Bank.

24.     In other words, it is the message of the protest that determines whether Defendants will respond with violent tactics and indiscriminate mass arrests.

25.     This case seeks justice for and accountability around the retaliatory, disproportionate, and unreasonable responses by the City of New York and its New York City Police Department ("NYPD") to Plaintiffs' constitutionally protected assemblies at non-violent demonstrations throughout New York City from October 21, 2023 and ongoing.

---

[11] Alex Kane, "Training for NYPD Officers Categorized the Keffiyeh and Watermelon as Antisemitic Symbols," *Jewish Currents*, Apr 24, 2025, available at https://jewishcurrents.org/training-nypd-keffiyeh-watermelon-antisemitism-israel-palestine.

26.     The City of New York violated, and will continue to violate, Plaintiffs' rights at the Palestine Protests for the purpose of suppressing Plaintiffs' speech in support of Palestinian human rights.

27.     Several Plaintiffs have been arrested and injured at multiple protests in support of Palestinian human rights.

28.     Despite the likelihood that they, along with Class Members, will face the same or similar harms at future Palestine Protests, they have every intention of continuing to protest on behalf of Palestinian human rights.

29.     It is likely they will face the same harms described herein at future demonstrations because, in part, they will continue engaging in the same types of conduct that Defendants have targeted them for previously.

30.     For example, upon information and belief, NYPD members' official training teaches officers to target individuals wearing a Kuffiyeh, which Plaintiffs wear regularly, as part of their everyday ensemble.

31.     The Kuffiyeh is a traditional scarf with patterns representing Palestinian history and culture.

32.     Yet the NYPD, falsely labels the Kuffiyeh as hateful and "antisemitic."

33.     In response to these constitutionally protected demonstrations, NYPD members, including many high-level officers as well as members of the NYPD's notoriously brutal Strategic Response Group ("SRG"), have descended upon the protestors and brutally assaulted and/or arrested them, indiscriminately and with excessive force.

34.     Defendants' conduct caused serious, and in many cases, lasting physical and emotional injury to members of the class.

35.     Thus, Plaintiffs, on behalf of themselves and all others similarly situated, seek damages for all members of the class as well as declaratory and injunctive relief to end the NYPD's unlawful policies and practices with regard to policing and responding to lawful demonstrations.

## JURISDICTION

36.     This Court has subject matter jurisdiction over Plaintiffs' federal claims pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3) and (4) and over Plaintiff's state law claims pursuant to 28 U.S.C. §1367(a).

37.     The federal civil rights claims in this action are brought pursuant to 42 U.S.C. § 1983 for violations of the First, Fourth, Fifth, and Fourteenth Amendments to the Constitution of the United States.

38.     The Federal Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, and Fed. R. Civ. P. 57 and 65 authorize this Court to grant Plaintiffs the declaratory and injunctive relief they pray for herein.

39.     An award of costs and attorneys' fees is authorized pursuant to 42 U.S.C. § 1988, as well as under the various state and City laws set out below.

## VENUE

40.     Venue is proper in the United States District Court for the Southern District of New York pursuant to 28 U.S.C. § 1391(b)(1) and (b)(2) as Defendant City has offices in this district, several Class Representatives live in this district, and a substantial part of the events and/or omissions described herein were committed in this district.

## PARTIES

41.     Plaintiff MONÉ MAKKAWI (Ms. Makkawi; she/her) is a resident of the state of New York.

42.     Plaintiff ROHAAN GILL (Mr. Gill; he/him) is a resident of the state of New York.

43.     Plaintiff LOAY ELASMAR (Mr. Elasmar; he/him) is a resident of the state of New York.

44.     Plaintiff MIGUEL FIGUEROA (Mr. Figueroa; he/him) is a resident of the state of New York.

45.     Plaintiff AHMED ELSAYED (Mr. Elsayed; he/him) is a resident of the state of New York.

46.     Plaintiff ARIB HASAN (Mr. Hasan; he/him) is a resident of the state of New York.

47.     Plaintiff CARLA TEJADA (Ms. Tejada; she/her) is a resident of the state of New Jersey.

48.     Plaintiff BENJAMIN WILSON (Mx. Wilson; they/them) is a resident of the state of New York.

49.     Plaintiff ETHAN WRIGHT (Mr. Wright; he/him) is a resident of the state of New York.

50.     Plaintiff MALIK SALTI (Mr. Salti; he/him); is a resident of the state of New York.

51.     Plaintiff BRYAN VIVAS (Mr. Vivas; he/him); is a resident of the state of New York.

52.     Defendant CITY OF NEW YORK (the "City") is a municipal entity created and authorized under the laws of the State of New York. The City is authorized by law to maintain a police department, and does maintain the NYPD, which acts as its agent in the area of law enforcement and for which it is ultimately responsible. The City assumes the risks incidental to the maintenance of a police force and the employment of police officers.

53.     Defendants SERGEANT JOEL A. MOTTOLA (Shield No. 4982, NYPD Tax Registration No. 950922); NYPD DEPUTY CHIEF TIMOTHY J. BEAUDETTE (NYPD Tax Registration No. 903414), NYPD OFFICER HOWARD THORNTON (Shield No. 14002; NYPD Tax Registration No. 961369); NYPD LIEUTENANT MICHAEL BUTLER (NYPD Tax Registration No. 948725); NYPD SERGEANT TALHA AHMAD (Shield No. 3038; NYPD Tax Registration No. 967741); NYPD OFFICER OMAR DELAROSA (Shield No. 6614; NYPD Tax Registration No. 964474); NYPD DETECTIVE BRIAN GREIG (Shield No. 3374; NYPD Tax Registration No. 947048); NYPD SERGEANT ANDONIOS CONSTANTATOS (Shield No. 1640; NYPD Tax Registration No. 959563); NYPD DEPUTY CHIEF JESSE LANCE (NYPD Tax Registration No. 923789); NYPD OFFICER JOSEPH CUNNINGHAM (Shield No. 18854; NYPD Tax Registration No. 974810); ASSISTANT CHIEF JAMES MCCARTHY (NYPD Tax Registration No. 885671); NYPD OFFICER STEVEN LI (Shield No. 7785; NYPD Tax Registration No. 976225); NYPD OFFICER JOAHAN GOMEZ (Shield No. 9052; NYPD Tax Registration No. 976148); NYPD LIEUTENANT RICARDO LAWRENCE (NYPD Tax Registration No 952972); NYPD OFFICER HIRAM VELEZ (Shield No. 272; NYPD Tax Registration No. 978273); NYPD MEMBER AHEISHA GRANT (Tax Registration No. 936694). and NYPD JOHN OR JANE MEMBER DOES 1-25 are NYPD police officers who unlawfully used excessive force, arrested, and/or detained Plaintiffs and others similarly situated in violation of their constitutional rights.

54.     Defendant NYPD Member John or Jane Does 1-25 were, at all times relevant to this First Amended Complaint, NYPD officers assigned to the police response on the street during the protests described herein. Plaintiffs do not currently know their names, but their names are known to Defendants. They are each sued individually and in their official capacity.

55.     At all times hereinafter mentioned, Defendants, either personally or through their employees, were acting under color of state law and/or in compliance with the official rules, regulations, laws, statutes, customs, usages and/or practices of the State or City of New York.

56.     Each and all of the acts and omissions of the Defendants alleged herein occurred while said Defendants were acting within the scope of their employment by Defendant City.

57.     Defendants were duly appointed and acting officers, servants, employees, and/or agents of Defendant City who were acting for, and on behalf of, and with the power and authority vested in them by Defendant City, and were otherwise performing and engaging in conduct incidental to the performance of their lawful functions in the course of their duties.

58.     Defendants were each and all responsible, in whole and/or in part, for the planning for and/or creation, promulgation, implementation, and/or enforcement of the unconstitutional policies, practices, and/or customs complained of herein, and/or condoned, acquiesced in, adopted, and/or approved of the same, through their acts and/or failures to act, as set forth more fully below.

59.     At all times relevant herein, as set forth more fully below, Defendants' actions and/or failures to act were malicious, intentional, knowing, and/or with a deliberate indifference to or a reckless regard for the natural and probable consequences of their acts and/or omissions.

60.     Although they were aware of the conduct, present for it, and knew or should have known it was unconstitutional, at no point did any of the Defendants, or any other member of the NYPD, take any steps to intervene in, prevent, or otherwise limit the unconstitutional conduct engaged in by their fellow officers.

61.     Each individual Defendant is sued in her or his individual and official capacities.

## COMPLIANCE WITH NEW YORK GENERAL MUNICIPAL LAW[12]

62.     Plaintiffs MONÉ MAKKAWI, ROHAAN GILL, LOAY ELASMAR, ARIB HASAN, CARLA TEJADA, BENJAMIN WILSON, and ETHAN WRIGHT filed timely Notices of Claim and attended a hearing pursuant to section 50-h of the New York General Municipal Law.

63.     Plaintiffs MALIK SALTI and BRYAN VIVAS filed timely Notices of Claim.

## JURY DEMAND

64.     Plaintiffs demand a trial by jury in this action on each and every one of their claims for which a jury trial is legally available.

## STATEMENT OF FACTS

### Examples of the NYPD's Disproportionate Violence Against Pro-Palestine Protestors Since October 2023

**October 21, 2023 protest in Bay Ridge, Brooklyn.**

65.     On October 21, 2023, as pro-Palestine protestors marched in Bay Ridge, members of the NYPD kettled, violently assaulted, and falsely arrested protestors as a pretext to disrupt and ultimately end the protest after hours went by without incident. Videos and photos taken at the march show NYPD officers punching protesters and pulling protesters off the sidewalk and slamming them into the ground, leaving many with physical injuries. *See Moussa et al. v. City of New York,* 1:25-cv-00442 (S.D.N.Y. March 15, 2025).

---

[12] Plaintiffs complied with the notice of claim provisions of the Gen. Mun. L., but compliance was not necessary because this case is "a class action brought to protect civil rights." *Coggins v County of Nassau*, 988 F. Supp 2d 231, 251 (E.D.N.Y. 2013). Plaintiffs Ahmed Elsayed and Miguel Figueroa did not file timely Notices of Claim. For some of those Plaintiffs that did file timely notices of claim, they have complied with all conditions precedent to commencing an action under state law and at least thirty days have elapsed since service of those Plaintiffs' Notices of Claim and adjustment and payment thereof has been neglected or refused.

**May 11, 2024 Nakba Day protest in Prospect Heights, Brooklyn.**

66.     For nearly ten years, Palestinians in New York City have commemorated Nakba Day, the anniversary of the 1948 violent expulsion of most Palestinians living in the territory that would become the State of Israel.

67.     These commemorations have typically included an annual march and protest, often attended by Palestinians and non-Palestinians alike in support of Palestinian human rights and an end to the Occupation and ethnic cleansing of Palestinians.

68.     In 2024, there were multiple marches for Nakba Day.

69.     For each Nakba Day commemoration, the NYPD deployed hundreds of NYPD officers in riot gear and sent corrections buses to the protest locations in advance.

70.     The first of the two, on May 11, 2024, began with a rally at the Barclays Center in Brooklyn, and was attended by thousands of people.

71.     The NYPD engaged in activities that violated the constitutional rights of individuals who were protesting, including, *inter alia*, violently attacking protestors, throwing them to the ground, dragging them, assaulting minors, and ultimately arresting many of the protestors without lawful justification and without fair warning.

72.     Protestors were physically restrained with flex-cuffs in such a manner that caused them unnecessary pain and suffering and, in some cases, possible serious and long-term nerve damage.

73.     They were also subjected to lengthy and unnecessary arrest processing.

74.     NYPD members detained credentialed members of the press.

75.     NYPD members also indiscriminately and unnecessarily used pepper spray.

76.     The actions of NYPD members caused concussions, broken bones, lacerations, nerve damage, and psychological injuries, some of which may be long-term or permanent.

**May 18, 2024 Nakba Day protest in Bay Ridge, Brooklyn.**

77.     For nearly ten years, the Palestinian community of Bay Ridge has commemorated Nakba Day with a rally and march.

78.     On May 18, 2024, however, instead of allowing that tradition to continue peacefully, the NYPD unleashed an unprecedented level of violence and brutality against protestors—again deploying hundreds of police officers in riot gear and sending corrections buses in advance.

79.     On several occasions, NYPD members brutally attacked members of the crowd with reckless abandon. NYPD members caused severe injuries to many protestors, including some that will alter people's lives.

80.     The NYPD engaged in activities that violated the constitutional rights of individuals who were protesting on behalf of Palestinian human rights, including, *inter alia*, violently attacking protestors, throwing them to the ground and into buildings and lamp posts, punching them, dragging them, ripping hijabs off of women, breaking a protestor's wheelchair, choking people, beating a minor, and ultimately arresting many of the protestors without lawful justification and without fair warning.

81.     Protestors were physically restrained with flex-cuffs in such a manner that caused them unnecessary pain and suffering and, in some cases, possible serious and long-term nerve damage.

82.    They were also subjected to lengthy and unnecessary arrest processing. NYPD members detained credentialed members of the press, purposefully hid their identities, and used pepper spray.

83.    These actions caused concussions, traumatic brain injuries, broken bones, lacerations, hematomas, nerve damage, and psychological injuries, some of which make be long-term or permanent.

84.    After being confronted with videos showing NYPD members violently arresting protestors, Mayor Adams praised and ratified the behavior, calling officers' actions "commendable."

85.    Then-Deputy Commissioner Kaz Daughtry also spoke positively of the NYPD's conduct at Nakba Day.

**August 14, 2024 Protest in Harlem**

86.    On August 14, 2024, protestors gathered to protest a fundraiser for the Democratic Party in Harlem, where then-Vice President Kalama Harris was scheduled to appear.

87.    At the conclusion of the protest, tens of protestors marched to a nearby restaurant, where fundraiser attendees were reportedly having dinner.

88.    Several protestors entered the restaurant and began protesting inside the restaurant.

89.    For the first time that evening, members of the SRG arrived, some on bikes, and forced their way into the crowd.

90.    After quickly removing the protestors inside the restaurant, SRG members began pulling protestors out of the crowd on the sidewalk, seemingly at random and without warning, and assaulting, and arresting them.

91.     SRG members were captured on video pushing their bikes into the crowd of protestors and indiscriminately swatting their batons at protestors.

92.     Lieutenant Raul Stephenson violently pulled a young woman out of the crowd and threw her onto the floor. With one hand, he choked the young woman by her hijab, and with the other, he used his baton to swat at protestors.

93.     SRG members then pushed protestors into the street, where they assaulted and arrested more protestors.

94.     Upon information and belief, SRG members assaulted and removed the hijabs of at least two young women that evening.

95.     Protestors were physically restrained with flex-cuffs in such a manner that caused them unnecessary pain and suffering.

**February 18, 2025 protest in Borough Park, Brooklyn.**

96.     On February 18, 2025, pro-Palestine protesters gathered to protest a real estate event which sold properties in illegal settlements in the Occupied West Bank.

97.     Pro-Israel protesters gathered, in equal or greater number than the pro-Palestine protestors.

98.     NYPD members forced pro-Palestine protestors into a barricade and attempted to control all entry and exit points.

99.     Upon information and belief, NYPD members allowed pro-Israel protestors to move freely around the protest area and to freely approach the area in which pro-Palestine protestors were barricaded.

100.    In the presence of the NYPD, pro-Israel protestors repeatedly assaulted and menaced pro-Palestine protestors.

101.    Pro-Israel protestors were captured on video punching Palestine protestors in the face and throwing jugs of water from the tops of multi-story buildings, at least some of which occurred in the presence of NYPD officers, who failed to intervene.

102.    At least two pro-Palestine protestors went to the hospital for medical treatment as a result of attacks by pro-Israel protestors.

103.    NYPD members made no arrests related to those attacks.

104.    Upon information and belief, NYPD members made only two arrests that evening, both of pro-Palestine protestors.

**April 24, 2025 Ben Gvir protest in Crown Heights, Brooklyn.**

105.    On April 24, 2025, Israeli national security minister Itamar Ben Gvir attended an event in Crown Heights, Brooklyn during a visit to the United States.

106.    Ben Gvir is notorious for his far-right wing extremism and brazen anti-Arab racism.

107.    He is an ultranationalist who has advocated for the ethnic cleansing of Palestinians and Gaza and for their continued starvation.

108.    He has been indicted dozens of times and convicted on at least eight occasions of crimes which include incitement to racism and support for a terrorist organization.[13]

109.    During his visit, dozens of protestors for Palestine demonstrated outside that event.

110.    Pro-Palestine protestors were significantly outnumbered by supporters of Ben Gvir, who engaged in repeated acts of intimidation, harassment, and assault in the presence of Defendant NYPD members.

---

[13] Melanie Lidman, "Who is Itamar Ben-Gvir, the far-right minister who visited a contested Jerusalem holy site?" Associated Press, July 18, 2024, available at https://apnews.com/article/israel-palestinians-bengvir-jerusalem-alaqsa-cd27dfed6d63f4dec3eae2f51ee23ff0

111.    These pro-Israel demonstrators hurled eggs and other objects at the small group of pro-Palestine protestors, with members of the NYPD standing closely by and repeatedly failing to intervene.

112.    When the small group of pro-Palestine protestors found themselves in increasing danger due to the behavior of the pro-Israel protestors, they asked members of the NYPD to escort them to a subway station so they could go home.

113.    Upon information and belief, members of the NYPD refused to do so.

114.    Left with no assistance by members of the NYPD who stood closely by, when members of the pro-Palestine protest were forced to walk through the crowd of pro-Israel protestors, those protesters hurled objects at them, leading to at least one person bleeding from her head, requiring her to go to the hospital for medical treatment, including receiving multiple stitches.

115.    Shortly thereafter, dozens of counter-protestors, all of whom appeared to be men, chased a woman—who lived in the neighborhood, but who they believed to be part of the protest— and threw objects at, kicked, and spat at her, while chanting "death to Arabs!" and threatening her with rape. Members of the NYPD who witnessed this attack not only failed to protect the woman, but they notably made no arrests related to the attack.[14]

**April 28, 2025 Ben Gvir protest in Ocean Parkway, Brooklyn.**

116.    Later that week, at another protest of Itamar Ben Gvir, where pro-Palestine and pro-Israel protestors engaged in some similar conduct (i.e. standing in the roadway and failing to disperse), NYPD members responded exclusively to pro-Palestine protesters with excessive and unnecessary force.

---

[14] "Mob of Orthodox Jewish men chases woman after protest at Brooklyn synagogue." The Guardian, Apr. 28, 2025, available at https://www.theguardian.com/us-news/2025/apr/28/mob-orthodox-jewish-men-chases-woman.

117.    In one instance, a member of the NYPD pushed an 18-year-old into the street, threw her onto the ground, and punched her repeatedly in the head.

118.    Rather than intervening, tens of other officers stood around this officer and the young girl, doing nothing to protect her.

119.    Multiple other members of the NYPD then used the weight of their bodies to slam her head and body into the ground.

120.    While NYPD officers assaulted and arrested her, pro-Israel protesters—while standing in the roadway—cheered NYPD officers on, screaming "hit her" and shouted slurs at the young woman.

121.    Shortly after, NYPD officers were seen tackling a young man to the ground, pushing his head into the concrete, and then lifting him up, choking him with his sweatshirt, and slamming him into a police van several feet away—again, while counter-protestors chanted and cheered in the roadway.

122.    Defendant NYPD members assaulted and arrested at least one minor.

123.    Protestors were physically restrained with flex-cuffs in such a manner that caused them unnecessary pain and suffering.

124.    Even after pro-Israel protestors spit at and assaulted people, upon information and belief, NYPD members used no force against those protestors.

**May 8, 2025 protest at Brooklyn College.**

125.    On May 8, 2025, several dozen protestors in support of Palestinian human rights gathered outside the gates of the City University of New York's Brooklyn College, to support students protesting within the gates of the campus.

126.     After members of the NYPD detained several people outside the gates of the campus, the remaining protesters attempted to disperse together and headed to the nearest subway station.

127.     When the small group stopped on a sidewalk in front of Brooklyn College's Hillel House and a protestor began speaking to the crowd, members of the NYPD, including some of the individual Defendants, suddenly attacked the group.

128.     Defendant members of the NYPD pushed into the crowd and, without warning, began punching, kicking, and slamming students to the ground.

129.     Defendant members of the NYPD tased one student, Plaintiff Bryan Vivas, repeatedly.

130.     All of these activities were without lawful justification.

**Other Allegations about the Palestine Protests Identified Above.**

131.     All of these activities alleged by the NYPD above were without lawful justification.

132.     They were taken pursuant to overlapping policies and practices that include, *inter alia*, the use of excessive force, false arrests, and excessive and unreasonable detention.

133.     These overlapping policies and practices have existed for years and have often resulted in litigation.

134.     Defendants have acknowledged and admitted to their failures to remedy these unconstitutional policies in recently released reports by, *inter alia*, the New York City Department of Investigation and the New York City Corporation Counsel, as detailed elsewhere herein.

135.     Additionally, as described above, below, and throughout this complaint, at Palestine Protests, members of the NYPD have engaged in extreme violence on a scale inconsistent

with other protests, because of the City's disagreement with and distaste for the message of the Palestine Protests.

136.    The City's tolerance, in the past, of – for example – command-level officers describing "kick[ing protesters'] ass[es]" at protests as "FUN" and "play"[15] has led to a culture where extreme violence against people with a message perceived as disfavored is considered not just permissible, but encouraged.

137.    That has directly led to injuries on an extreme scale.

138.    Just among cases already filed from the Palestine Protests, there are at least seven cases with serious traumatic brain injuries alleged from the Palestine Protests, largely from forbidden baton strikes to the head.[16]

## THE NYPD'S PERMISSIVE RESPONSE TO OTHER DEMONSTRATIONS

139.    The NYPD's violent response to the pro-Palestine protests discussed herein was dramatically different from their response to other kinds of protests and rallies.

140.    On July 11, 2020, pro-police demonstrators held a "Rally to Back the Blue" in Dyker Heights, Brooklyn. Pro-police marchers yelled at and antagonized counter-protestors, making racist and sexist statements, grabbing them, and spitting in counter protestors' faces. The NYPD made no arrests at the rally.[17]

---

[15] *See, e.g., Rodriguez v. City Of New York*, 21-cv-10815, ECF No. 107-1 (SDNY) (text messages from Captain Delgado, that the City fought to keep sealed, where he refers to assaulting protesters as "play," is told by a subordinate to "kick their ass," and says "LET'S HAVE FUN" referring to a Black Lives Matter protest in Mott Haven in the Bronx).  Upon information and belief, neither he nor the relevant subordinate were disciplined.

[16] *See, e.g., Shapiro-Barnum v. City of New York*, 156417/2025 (N.Y. Cty. Sup. Ct.); *Dehghan v. City of New York*, 517684 (Kings Cty. Sup. Ct.); *Hasnain v. City of New York*, 157094 (N.Y. Cty. Sup. Ct.); *Nijjar v. City of New York*, 157102/2025 (N.Y. Cty. Sup. Ct.); *Nijjar v. City of New York*, 157297/2025 (N.Y. Cty. Sup. Ct.); *Lefkowitz v. City of New York*, 159963/2025 (N.Y. Cty. Sup. Ct.); *Holmes v. City of New York*, 160131/2025 (N.Y. Cty. Sup. Ct.).

[17] Sydney Pereira, *Videos Show Pro-Police demonstrators in Brooklyn Unleashing Racist, Sexist Vitriol Against Counter-Protestors*, Gothamist, July 12, 2020, available at https://gothamist.com/news/police-rally-back-the-blue- brooklyn-dyker-heights

141.    On July 13, 2020, pro-police "Blue Lives Matter" groups held a march in Bay Ridge, Brooklyn. The march was attended by counter-protestors organized against police brutality. Though members of the pro-police group shouted racist and homophobic slurs at the counter protesters and assaulted them in view of NYPD officers, only two people were arrested – both Black men protesting police brutality. By contrast, a Blue Lives Matter demonstrator who punched a woman in the face in view of NYPD officers was not arrested.[18]

142.    In October 2020, hundreds of members of the ultra-Orthodox Jewish community in Brooklyn gathered in Borough Park to protest coronavirus restrictions imposed by Governor Cuomo. The protestors set fires in the street and threw masks into the flames. They chased away NYC Sheriff's Deputies and attacked a photojournalist reporting on the protest. An ultra-Orthodox Jewish man who opposed the protestors was attacked by protestors and beaten with rocks. Police said that no arrests or summons were issued to the protestors on the night of the rally.[19]

143.    On October 25, 2020, a group called Jews For Trump convoyed hundreds of cars draped with American flags and Trump 2020 banners. The caravan traveled from Coney Island to the Trump Tower in Manhattan before heading to a rally in a Brooklyn park. Despite engaging in acts of disorder during this caravan, this rolling group of pro-Trump agitators was allowed to continue unhindered by the NYPD.[20]

144.    On November 1, 2020, a coalition of Trump supporters in a vehicle caravan were escorted through New York City despite blocking numerous bridges and committing acts of

---

[18] Jake Offenhartz and Gwynne Hogan, *"They Defend Their Own Side": NYPD Accused of Protecting Blue Lives Matter Marchers in Bay Ridge*, Gothamist, July 13, 2020, available at https://gothamist.com/news/nypd-accused- protecting-violent-blue-lives-matter-marchers-bay-ridge
[19] Jake Offenhartz, *Orthodox Borough Park Residents Burn Masks, Beat Dissenters Over COVID Lockdown*, Gothamist, Oct. 7, 2020, available at https://gothamist.com/news/orthodox-borough-park-residents-burn-masks-beat- dissenters-over-covid-lockdown.
[20] AP, *Jews For Trump car parade stirs protests, fights across NYC*, Oct. 26, 2020, available at https://abc7ny.com/jews-for-trump-times-square-protest-today-in-riot/7343862/

violence. One bystander attempted to photograph an obscured license plate of a vehicle in the caravan, but the driver of the vehicle drove into her, and police threw her to the ground.[21]

145.    On December 2, 2020, hundreds gathered in Staten Island to demand the reopening of a bar that was closed for violating the heath regulations related to COVID-19. Protestors blocked traffic and hundreds gathered on the streets and sidewalks. Though NYPD deputies were stationed outside the bar, it was reported that no arrests or summons were issued. [22][23]

146.    Individuals associated with the Red Rose Rescue—a group identified by the New York State Attorney General as a "Militant Anti-Abortion Group" that invades clinics and blocks access to reproductive health—also routinely march and protest in NYC. However, the NYPD often treats members of this group more favorably, including not making arrests and not using excessive force, while arresting and using excessive force against people protesting for Palestine.[24]

147.    The NYPD has a history of treating even violent right-wing extremists more permissively than people protesting for Palestine. This pattern can be observed from the 1990s to the present. By way of non-exhaustive example:

    a.   In the early 1990s the NYPD stood by and took no action when a group of skinheads attacked a group of peaceful demonstrators. *Dwares v. City of New York*, 985 F.2d 94 (2d Cir. 1993).

    b.   In 1992, the Patrolmen's Benevolent Association, egged on by mayoral candidate Rudy Giuliani, held a demonstration at City Hall Park in response to Mayor Dinkins's call for a Civilian Complaint Review Board. This led to one of the biggest

---

[21] Jake Offenhartz, *Photos: Police Stand By As Caravans Of Trump Supporters Block Bridges, Gothamist*, Nov. 2, 2020, Threaten Counter-Protesters, available at https://gothamist.com/news/photos-police-stand-caravan-trump- supporters-block-bridges-threaten-counter-protesters

[22] Wilson Wong, *Hundreds protest closing of Staten Island bar that refused Covid-19 measures*, NBC NEWS, Dec. 3, 2020, available at https://www.nbcnews.com/news/us-news/hundreds-protest-closing-staten-island-bar-refused- covid-19-measures-n1249873

[23] NBC News 4, *Staten Island Bar Reopens, Defying City and State COVID Orders Once Again*, December 5, 2020, available at https://www.nbcnewyork.com/news/coronavirus/staten-island-bar-reopens-defying-city-and-state-covid- orders-once-again/2762850/

[24] https://ag.ny.gov/press-release/2023/attorney-general-james-sues-militant-anti-abortion-group-invading-clinics-and (The Attorney General announcing a lawsuit being filed against the Red Rose Rescue seeking to bar them from coming within 30 feet of any reproductive health care facility in New York State.)

riots in New York City history. On-duty police officers who were present did little to stop it, and even encouraged it, despite the fact that the off-duty rioting officers blocked the Brooklyn Bridge, stormed City Hall, committed acts of vandalism, and assaulted bystanders.[25] [26]

    c.  More recently, the NYPD has turned a blind eye to violence committed by the Proud Boys and other neo-Nazi groups. In one such instance in October of 2018, a mob of uniformed Proud Boys and right-wing skinheads cried homophobic slurs and kicked and stomped a person laying on the sidewalk. NYPD officers observed the violence but did not intervene to stop it. Instead, the NYPD was more concerned with controlling left-wing activists.[27] During this incident three left wing activists were arrested but not a single Proud Boy was questioned or arrested. Proud Boy leader Gavin McInnes boasted about the incident that the group had support from "[t]ons of cops, I have a lot of support in the NYPD…"[28]

## THE NYPD'S HISTORY OF MISHANDLING CERTAIN PROTESTS

148.    The extensive deprivations of constitutional rights suffered by Plaintiffs here are part of the NYPD's long history of aggressive and unconstitutional policing of certain First Amendment-protected activities going back many years, including, inter alia, protests denouncing the murder of Amadou Diallo in 1999, as well as protests against the World Economic Forum (the "WEF") in 2002, the Iraq War in 2003, the Republican National Convention ("RNC") in 2004, the Occupy Wall Street ("OWS") protests in 2011 and 2012, and many other protests since, including Black Lives Matter and anti-police brutality protests.

149.    The NYPD response to pro-Palestine protests is in line with its history of violent and unconstitutional responses to past protests challenging police conduct in New York City,

---

[25] Nat Hentoff and Nick Hentoff, Rudy's Racist Rants: An NYPD History Lesson, Cato.org, July 14, 2016, available at https://www.cato.org/commentary/rudys-racist-rants-nypd-history-lesson
[26] Pamela Oliver, When the NYPD Rioted, University of Wisconsin – Madison, July 18, 2020, available at https://www.ssc.wisc.edu/soc/racepoliticsjustice/2020/07/18/when-the-nypd-rioted/
[27] Jake Offenhartz, NYPD Accused Of 'Incredibly Deferential Treatment' Of Proud Boys Following Beatings Caught On Video, available at, https://gothamist.com/news/nypd-accused-of-incredibly-deferential-treatment-of-proud- boys- following-beatings-caught-on-video
[28] Jake Offenhartz, Proud Boys Leader: 'I Have A Lot Of Support In The NYPD', Gothamist, Oct. 15, 2018, https://gothamist.com/news/proud-boys-leader-i-have-a-lot-of-support-in-the-nypd

including its treatment of certain First Amendment assemblies with demoralizing and brutal shows of force, rather than genuine efforts to facilitate protesters' protected First Amendment activity.

150.    For example, the NYPD met protests following the start of the Iraq War in 2003 with mass arrests, excessive force, and use of pepper spray.[29]

151.    The next year, during the police "Operation Overlord II" operation in response to the Republican National Convention in 2004, NYPD members treated protestors to similar uses of excessive force and mass arrests, and excessive and unreasonable detention.[30]

152.    The NYPD continued to employ similar mass arrest and excessive force tactics during a years-long crackdown on Critical Mass bicycle rides beginning in 2004.[31]

153.    Similarly, during the Occupy Wall Street ("OWS") protests in 2011, the NYPD used excessive force against protestors, bystanders, and National Lawyers Guild – New York City Chapter Legal Observers.[32]

154.    Additionally, Defendants have employed the same tactics and practices against Black Lives Matter, police accountability, pro-Palestine and other, similar protests, over the intervening years.

155.    Following NYPD conduct during these and other protests, the City of New York and the NYPD and its members have been sued repeatedly by protestors who alleged that they had been unlawfully detained, kettled, arrested, subjected to mass arrest, unreasonable and prolonger detentions and violations of their First Amendment and other, related rights, much in the same manner as have Plaintiffs in this case.

---

[29] *See, e.g.*, N.Y. Civil Liberties Union, Arresting Protest (2003), available at https://www.nyclu.org/sites/default/files/nyclu_arresting_protest.pdf.
[30] *See, e.g.*, N.Y. Civil Liberties Union, Rights and Wrongs at the RNC (2005), available at https://www.nyclu.org/sites/default/files/publications/nyclu_pub_rights_wrongs_rnc.pdf.
[31] *See*, *e.g., Callaghan v. City of New York*, 07 Civ. 9611 (PKC)(JLC) (S.D.N.Y.).
[32] *See People of the State of New York v. City of New York et al.*, 21-cv-0322, Dkt. No. 1 at ¶ 26 (S.D.N.Y.).

156.    In many of these cases Defendants employed tactics developed and modified over the course of many years by former Commissioner Shea, former Chief Monahan, and their predecessors and by other defendant City policymakers at and in connection with other demonstrations in the City dating back to around 2000 and continuing through the present, including the policies, practices, and customs complained of herein, and also described and litigated in the following cases, the most recent of which was filed in March of this year:

a. *Haus v. City of New York*, 03-cv-4915 (RWS)(MHD) 2006 WL 1148680, *1 (S.D.N.Y. April 24, 2006) (class action challenging arrests, detentions, and prosecutions of around 300 people in connection with February 15, 2003 anti-war protests, alleging that arrests were made without probable cause and pursuant to Department directive to "engage in pre-emptive mass arrests and to subject arrestees to delayed and arduous post-arrest processing." *See also Larsen v. City of New York, et al*., 04-cv-0665 (RWS) (S.D.N.Y.);

b. *Burley v. City of New York*, 03-cv-2915 (WHP)(FM) 2005 WL 668789 (S.D.N.Y. March 23, 2005) (class action arising from mass arrests of over 200 demonstrators during 2002 WEF in New York City challenging, *inter alia*, (1) NYPD policy of detaining perceived protesters who were otherwise eligible to be released earlier with DATs for excessive periods of time and denying them consideration for DAT release on the grounds of their perceived participation in protests and (2) policy and practice of using plastic flex cuffs as unreasonable and excessive because of the manner in which the handcuffs were applied and the length of time for plaintiffs were handcuffed);

c. *Kunstler v. City of New York*, 04-cv-1145 (RWS)(MHD) (S.D.N.Y.) and other related cases arising from alleged false and retaliatory arrests in connection with police responses to protests on April 7, 2003, raising *Monell* and other claims similar and related to the policies and practices complained of herein such as using extremely       tight       plastic       handcuffs       in       their       arrest;

d. *MacNamara v. City of New York*, 04-cv-9216 (RJS)(JCF) (S.D.N.Y.) (including the Second Amended Class Action Complaint, Dkt. No. 200-2), *Abdell v. City of New York*, 05-cv-8453 (RJS)(JCF) (S.D.N.Y.), *Schiller v. City of New York*, 04-cv-7922 (RJS) (JCF) (S.D.N.Y.), *Dinler v. City of New York*, 04-cv-7921 (RJS)(JCS) (S.D.N.Y.), *Kyne v. Wolfowitz,* 06-cv- 2041 (RJS)(JCF) (S.D.N.Y.) (including the Second Amended Complaint, Dkt. No. 18), and the dozens of other cases consolidated for discovery purposes in the S.D.N.Y. arising from arrests made, and policies related to, the RNC in New York City in 2004. *See, e.g., Schiller*, No. 04-cv-7922 (RJS)(JCF), 2008 WL 200021 at *2-5 (S.D.N.Y. Jan. 23, 2008) (noting the City's consent to amendment of complaints in RNC cases to add, *inter alia*,

"constitutional challenges to the defendants' alleged practice of detaining . . . all persons in connection with the RNC . . . no matter how minor the infraction, rather than issuing summonses on the street"); *MacNamara v. City of New York,* 275 F.R.D. 125, 154 (S.D.N.Y. 2011) (certifying six "mass arrest subclasses" as well as an "Excessive Detention Class" comprised of all RNC arrestees who were processed pursuant to the RNC Mass Arrest Processing Plan and a "Conditions of Confinement Class, comprising all RNC arrestees who were handcuffed with plastic flex cuffs[.]"); *Dinler*, No. 04-cv-7921 (RJS)(JCF), 2012 WL 4513352, at *13-15 (S.D.N.Y. Sept. 30, 2012) (granting plaintiffs' motions for summary judgment on their false arrest claims related to hundreds of people mass arrested at 2004 RNC in connection with a War Resisters League march and denying defendants' cross-motion on false arrest claims); which complaint had a similar failure to train Monell claim that had been sustained through Defense Rule 12 and Rule 56 motions; and *Packard et al v. City of New York*, 15-cv-7130 (SDNY(AT)(SDA) that settled for a total payout including attorney fees of $980,000, and which complaint had a similar failure to train Monell claim that had been sustained through Defense Rule 12 and Rule 56 motions.

e.  *Allen v. City of New York,* 466 F. Supp. 2d 545, 546 (S.D.N.Y. 2006) (challenging mass arrests made in February 2002 related to the WEF alleging, *inter alia*, that the protestors remained on the sidewalk, walking two abreast and followed all rules of protesting, yet Executive Officers arrested them and "the police deliberately held [protesters] in custody for an unnecessarily long period of time in order to delay their arraignment in Criminal Court";

f.  *Moussa et al. v. City of New York,* 1:25-cv-00442 (S.D.N.Y. March 15, 2025) (lawsuit arising from October 21, 2023 pro-Palestine alleging, *inter alia*, that members of the NYPD engaged in policing motivated at least in part by discrimination against Arab, Palestinian, Pro-Palestinian, and Muslim protestors protesting in support of Palestine; that members of the NYPD kettled, violently assaulted, and falsely arrested protestors as a pretext to disrupt and ultimately end the protest);

## THE NYPD'S POLICY AND/OR PRACTICE OF USING EXCESSIVE FORCE TO CONTROL THE SPEECH OF PROTESTORS

157.    Defendants used types and levels of force that were excessive and unnecessary force against Plaintiffs.

158.    The uses of force against Plaintiffs were in contravention of, or inconsistent with, related, written NYPD policies and/or training.

159.    However, that use of force was consistent with and ratified within the unwritten policies of the NYPD.

160.    In "Police Use of Force in New York City: Findings and Recommendations on NYPD's Policies and Practices," an October 1, 2015 report published by the New York City Department of Investigation Office of the Inspector General for the NYPD ("OIG- NYPD")[33], the OIG-NYPD made several conclusions critical of the NYPD's then-extant use of force policies, including, *inter alia*, that:

   a.   NYPD's current use of force policy is vague and imprecise, providing little guidance to individual officers on what actions constitute force;

   b.   NYPD's current procedures for documenting and reporting force incidents are fragmented across numerous forms, and officers frequently use generic language that fails to capture the specifics of an encounter;

   c.   NYPD's patrol guide does not properly instruct officers to de-escalate encounters with the public;

   d.   NYPD training does not adequately focus on de-escalation; and

   e.   In the period reviewed, NYPD frequently failed to impose discipline even when provided with evidence of excessive force. OIG-NYPD Report at pp. 3-5.

161.    After October 1, 2015, the NYPD revised its Patrol Guide provisions, and designed, created, and implemented training, to include "updated definitions concerning force, new policies regarding de-escalation, responsibilities of witness officers in use of force incidents, reporting obligations concerning force incidents, and data analysis on use of force incidents." *See* OIG-NYPD Report at p. 2 *et seq*.; *see also* NYPD Patrol Guide Section 221-01[34] ("Force Guidelines")

---

[33] "Police Use of Force in New York City: Findings and Recommendations on NYPD's Policies and Practices," New York City Department of Investigation, Office of the Inspector General for the NYPD (October 1, 2015), *available at* http://www1.nyc.gov/site/oignypd/reports/reports.page ("OIG-NYPD Report") (last accessed April 1, 2022).
[34] Available online via the New York City Civilian Complaint Review Board ("CCRB") website at http://www.nyc.gov/html/ccrb/downloads/pdf/2016pg/pg221-01-force-guidelines.pdf.

and 221-02[35] ("Use of Force"), issued and effective June 27, 2016 (implementing changes to NYPD use of force policies in the form of revised written guidelines, incorporated into the NYPD's Patrol Guide).

162.    Under those revised NYPD written policies and procedures, NYPD members who use force are required to file written Threat, Resistance, and Injury ("TRI") reports when they use certain force, including, but not limited to, hand strikes, foot strikes, forcible take-downs, impact weapons (such as batons), and/or force that causes physical injuries, including bruising or swelling and the like. And supervisors are also required to conduct investigations and fill out TRI reports related to such uses of force.[36]

163.    Upon information and belief, Defendants failed to document, and/or require that fellow Defendants and/or other fellow NYPD members document and failed to investigate and/or supervise fellow NYPD members regarding, uses of force in accordance with related NYPD policies and/or training.

164.    Defendants used force that they knew, or should have known, would negatively impact Plaintiffs, and/or cause lasting pain, suffering, and/or injury, without making individualized or otherwise appropriate determinations about whether these uses of force were necessary, justified, or reasonable under these circumstances.

---

[35] Available online via the New York City Civilian Complaint Review Board website at http://www.nyc.gov/html/ccrb/downloads/pdf/2016pg/pg221-02-use-of-force.pdf.
[36] "Use of Force: Revised NYPD Policy," NYPD Use of Force Update- June 2016 (June 2016), at pp. 4-5, *available at* https://www.prisonlegalnews.org/media/publications/Use%20of%20Force%20-%20Revised%20NYPD%20Policy%20Booklet,%20NYPD,%202016.pdf ("NYPD Use of Force Update") (last accessed April 1, 2022) (footnotes omitted).

**NYPD'S VIOLENT RESPONSE TO PROTESTS FOR BLACK LIVES IN 2020**

165.     Protests against police violence erupted across the nation after the May 25, 2020 police killing of George Floyd, and there were loud demands for police accountability and support for the Black Lives Matter movement.

166.     For several months between May 2020 and January 2021, the NYPD engaged in a pattern and practice of using violence against protestors that was encouraged, sanctioned, and enforced by Defendant City and policymaking officials.

167.     On June 17, June 18, and June 22, 2020, New York State Attorney General Letitia James held hearings about the New York City Police Department's Response to Demonstrations wherein she found police officers "using excessive force against protesters, including use of batons and indiscriminate use of pepper, brandishing firearms at protesters, and pushing vehicles or bikes into protesters."[37]

168.     The Department of Investigation ("DOI") also conducted its own investigation and issued a report in response to the NYPD's response to the racial justice protests. [38]

169.     The DOI's review of NYPD policies revealed that the NYPD did not have a policy specific to policing protests or First Amendment-protected expression. Rather, the NYPD Patrol Guide covers demonstrations in policies related to policing of "special events," such as parades; "emergency incidents," such as civil disorder; or "unusual disorder," such as riots.[39]

---

[37] New York State Office of the Attorney General, *Preliminary Report on the New York City Police Department's Response to the Demonstrations Following the Death of George Floyd* (July 2020) https://ag.ny.gov/sites/default/files/2020-nypd-report.pdf
[38] The City of New York Department of Investigation, *Investigation into NYPD Response to the George Floyd Protests* (December 2020) https://www.nyc.gov/assets/doi/reports/pdf/2020/DOIRpt.NYPD%20Reponse.%20GeorgeFloyd%20Protests.12.18.2020.pdf
[39] *Id*. at 35.

170.     The DOI also found that "the force required to carry out a mass arrest was disproportionate to the identified threat," and "placed the burden of potential crime on a wide swath of people who had no apparent connection to that potential criminal activity." [40]

171.     Just one example of many instances of excessive use of the police was highlighted by Human Rights Watch and SITU Research,[41] a 99-page report providing a detailed account of the NYPD's response to the June 4 peaceful protest in Mott Haven—a low-income neighborhood populated mostly by minorities, that has experienced high levels of police brutality and ingrained systemic racism.[42]

172.     On June 4, 2020, thousands of police officers surrounded and trapped protesters in Mott Haven, employing a tactic known as "kettling." Officers then beat kettled protestors with their batons and used pepper spray on them before arresting over 250 peaceful protestors.

173.     Further reports and videos taken at that protest event show countless injuries sustained at the hands of law enforcement, including broken bones, sprained muscles and joints, and potential nerve damage due to overly tight zip ties.

174.     The HRW report further notes that, "Most of those injured did not receive any immediate medical care, as police arrested or obstructed volunteer medics in medical scrubs with red cross insignia. Dozens of people spent hours in detention with untreated wounds and their hands bound behind their backs."[43]

---

[40] *Id*. at 56.
[41] US: New York Police Planned Assault on Bronx Protesters **-** *Trapping, Beatings in June Crackdown Reveal Abusive, Unaccountable System.* See https://www.hrw.org/video-photos/video/2020/09/30/us-new-york-police-planned-assault-bronx-protesters-animation
[42] **"Kettling" Protesters in the Bronx –** *Systemic Police Brutality and its Costs in the United States.* See https://www.hrw.org/sites/default/files/media_2020/10/us_mott%20haven0920_web.pdf

[43] *US: New York Police Planned Assault on Bronx Protesters*, HUMAN RIGHTS WATCH (2020), available at https://www.hrw.org/news/2020/09/30/us-new-york-police-planned-assault-bronx-protesters.

175. Indeed, the NYPD has responded to protests by using unlawful force and false arrests as a matter of policy and practice and has done so on many occasions throughout the years as issues of police brutality rose to unconscionable levels.

176. *The People of the State of New York v. City of New York et al*, 21-cv-322 (CM)(GWG); *Rolon et al. v. City of New York, et al.,* 21-cv-02548(CM); *Payne et al v. De Blasio et al*, 20-cv-8924 (CM)(GWG) and *Gray, et al., v. City of New York, et al.,* 21-cv-06610 (CM)(GWG) resulted in a settlement promising substantial reforms to the NYPD's policing of first amendment activities including training, practices, and supervision.[44]

177. Yet, even on the heels of a settlement promising sweeping changes to police tactics related to policing demonstrations arising from the use of excessive force and other abusive tactics during the Black Lives Matter protests in the summer of 2020 and in 2021, the NYPD has continued to engage in actions related to policing pro-Palestine demonstrations such as the ones described herein, violating Plaintiffs' constitutional and other rights.

**THE NYPD'S FAILURE TO TRAIN REGARDING POLICING PROTESTS**

178. Since at least the 1990s, the NYPD has failed to appropriately train its officers on the proper handling of First Amendment assemblies, despite being on notice of serious constitutional deficiencies in their existing training.

179. In fact, the NYPD's core training related to protest response to this day is based on crowd management and disorder control tactics for policing large-scale civil disorder and riots.

180. In 1997, the NYPD's Disorder Control Unit ("DCU") created the "Disorder Control Guidelines."

---

[44] Stipulated Order, *In re New York City Policing During Summer 2020 Demonstrations*, 20-cv-8924, ECF No. 1099-2.

181.    Upon information and belief, to this day, that document forms the core of the NYPD protest response-related training.

182.    The Disorder Control Guidelines treat disorders as military engagements and copies military tactics and focus on tactics designed to deter, disperse, and demoralize groups, including by staging overwhelming presence and force at protest activity, as well as making early and "pro-active" arrests, and mass arrests, using disorder control formations, encirclement or kettling, and other, similar tactics.

183.    Upon information and belief, the core NYPD training, based on the Disorder Control Guidelines, focuses on the use of such tactics to – using the trainings' terminology – "disperse and demoralize" protesters.

184.    These disperse and demoralize tactics and trainings have persisted through the present.

185.    Upon information and belief, the Disorder Control Guidelines were never meant to be guidelines for the policing of lawful First Amendment assemblies such as demonstrations – only for large-scale civil disorder such as riots.

186.    However, neither the Disorder Control Guidelines, nor, upon information and belief, any related NYPD training, contain meaningful direction on the core First, Fourth, or Fourteenth Amendment principles that must guide constitutional policing of First Amendment assemblies.

187.    On information and belief, there was, and is, virtually no NYPD training—and certainly no meaningful NYPD training—focusing on how to utilize the tactics described in the Disorder Control Guidelines without infringing on the constitutional rights of protesters, such as

how to make probable cause determinations or the requirements of providing an alternative avenue of protest, meaningful time and a path of egress when issuing a dispersal order, and the like.

188.    Defendants' failures to train, which led to violations of Plaintiffs' rights in this case, include, *inter alia*, the following:

    a.  The failure to train, instruct, and discipline officers to discourage and prevent misconduct and assault by NYPD members;

    b.  The failure to make clear the need to provide constitutionally meaningful dispersal orders and opportunities to disperse or other, similar fair warning prior to using force or taking other enforcement action, including, for example, the manner in which to inform demonstrators they must move or disperse, how many warnings to give before taking enforcement action, the length of time to be given in order to provide a meaningful opportunity to comply, and the like;

    c.  The failure to provide training on the use of reasonable and proportionate force in connecting with policing First Amendment assemblies;

    d.  The failure to provide training on the need for, or tactics regarding, escort and facilitation of First Amendment activities, and instead training focused almost exclusively on tactics designed to "disperse and demoralize" protesters; and

    e.  The failure to ensure police response to protests and other protected activities are not based on the content thereof.

    f.  The failure to ensure police response to protests and other protected activities are not based on the appearance, nationality or culture of protestors.

189.    Although many of the above problems with the NYPD's training are endemic and cut across all of the relevant NYPD training, at present, Defendant City has a policy and practice of deploying one particularly problematic, inadequately trained, poorly supervised and undisciplined group of NYPD members: the NYPD's Strategic Response Group ("SRG").

190.    The SRG was created in 2015 as a specialized unit tasked with responding to disorder- causing events and to conduct counter-terrorism operations.

191.    The SRG has a unit in each of the five boroughs and the DCU has now been incorporated into the SRG.

192.    In response to the public's skepticism that the SRG would be used to crack down on protests, then-Chief of Department James O'Neill stated: "They will not be involved in handling protests and demonstrations. They'll have no role in protests. Their response is single fold. They'll be doing counter-terror work. They'll be assigned to different posts throughout the city."[45]

193.    However, since 2015, the SRG has been regularly deployed at protests, including those in 2020 related to the George Floyd protests, and in pro-Palestine protests around the city, such as the ones described herein.[46] [47]

194.    Many SRG members, including those deployed to the protest in this case, have histories of engaging in the kinds of misconduct complained of herein, documented among other places, by CCRB complaints, and in numerous lawsuits.[48]

195.    SRG members are meant to have additional DCU training.

196.    Upon information and belief, that additional DCU training is principally modelled on the core principles and tactics in the Disorder Control Guidelines.

197.    However, the City of New York has admitted that many of the officers deployed to respond to protests did not even receive that training, which was supposedly required of them.

[45] Ben Yakas, *NYPD: Fine, Maybe We Won't Police Protests With Machine Guns,* Gothamist, Jan. 30, 2015, available at https://gothamist.com/news/nypd-fine-maybe-we-wont-police-protests-with-machine- guns.
[46] Council on American-Islamic Relations, *CAIR-NY Calls on New York City Council to Disband the NYPD SRG, Invest in Community Programs Instead*, Mar 21, 2024, available at https://www.cair- ny.org/news/2024/3/21/cair-ny-calls-on-new-york-city-council-to-disband-the-nypd-srg-invest-in- community-programs-instead (reporting that from January 2024 to March 2024, the SRG been deployed to 205 peaceful protests since January, most of which were pro-Palestine protests).
[47] The New York Civil Liberties Unit, ACLU of New York, NYCLU on NYPD Violence at Pro-Palestine Protest in Bay Ridge, May 19, 2024, available at https://www.nyclu.org/press-release/nyclu-on-nypd-violence-at-pro-palestine-protest-in-bay-ridge.
[48] Ali Winston, NYPD Unit At Center Of Protest Policing Has Dozens Of Officers With Long Misconduct Histories, The Appeal, Oct. 15, 2020, available at https://theappeal.org/nypd-srg-misconduct.

198.    As a result, as noted in the OCC Report, "for a majority of the officers who were assigned to the George Floyd protests, their training on policing protest was limited to what they had received as recruits in the Academy.[49]

199.    Between at least 2004 and the present, the NYPD's mass arrest and violent crowd control and protest policing tactics have been on full display in the streets of New York City; the subjects of unfavorable coverage in the media, including coverage explicitly showing video evidence of NYPD members engaging in uses of excessive force in connection with disperse and demoralize while policing protests; documented in complaints to the Civilian Complaint Review Board and other agencies; as well as the litigations discussed above, which have cost the city tens of millions of dollars in judgments and settlements.

200.    Nevertheless, upon information and belief, at all times relevant herein, City policymakers routinely received reports regarding arrests made in connection with First Amendment assemblies. These internal reports include Unusual Occurrence Reports; Mass Arrest Reports including data tracking arrestees, the length of time it took them to go through the system, whether they were released with a summons or DAT, their proposed arrest charges, and other information related to the status and/or dispositions of the cases; internal critiques from supervisors and other officers involved in mass arrests related to police actions taken in relation to an event; and/or other reports including information arrests, use of force protest arrest processing, and/or related prosecutions.

201.    Despite the wealth of evidence of NYPD members' historic brutality against protesters, Defendant City has ignored, and/or failed to utilize relevant information, including

---

[49] New York City Law Department, Corporation Counsel Report (Dec. 2020) ("OCC Report"), https://www1.nyc.gov/assets/law/downloads/pdf/ProtestReport-np.pdf at page 37.

information gleaned from reports and lawsuits, as well as other data points, to identify deficiencies in NYPD training as it relates to constitutionally compliant protest policing.

202.   At bottom, the NYPD's near-exclusive focus on deterring, dispersing, and demoralizing in trainings related to policing protests, coupled with the failure to train on specific, relevant aspects of constitutional policing of protests, let alone how to encourage or facilitate protests—despite having received clear notice that NYPD policing of protests has caused the systemic violations of protesters' constitutional rights for years— demonstrates both a history and a policy of disregard for the First Amendment, Fourth Amendment, Fifth Amendment, Fourteenth Amendment, and other, related rights of Plaintiffs and other similarly injured protesters.

203.   Finally, upon information and belief, under the guise of combatting antisemitism, members of the NYPD have received protest training that is Islamophobic, Anti-Arab, and anti-Palestinian.

204.   Through this training, members of the NYPD are taught that symbols of Palestinian and Arab identity are antisemitic, and that they should prosecute them accordingly.[50]

### THE NYPD'S TRAINING TARGETS PRO PALESTINE CONTENT

205.   Upon information and belief, and under the pretextual guise of combating antisemitism, members of service receive training that is Islamophobic, antisemitic, and anti-Palestinian. The training is created by the "Combat Antisemitism Movement," an explicitly pro-Israel and anti-Palestinian organization.

206.   Indeed, current NYPD Commissioner Jessica Tisch offered opening remarks at a recent "Combat Antisemitism Movement" session.

---

[50] Kane, *supra* n. 11.

207. Upon information and belief, said training, which thousands of members of service have sat for, declares the following false, discriminatory, and bias statements that fuel the NYPD's violent response to protest centered around Palestine:

    a. "Islamism is a political ideology where Islamic law overrides the Law of Man";

    b. "Jihadism is a subset of Islam that uses violence to impose Islamic Law"

208. Upon information and belief, the training includes a racist cartoon depicting people from the Middle East in a "Suicide Bombing Class" taking "Human-Bomb Course-Work" wherein the instructor, donning a beard and turban, is wrapped in explosives.

209. Upon information and belief, the training characterizes students protesting in support of Palestine as "young bored and looking for purpose" thus leading them to become "extremists."

210. Upon information and belief, the training designates student groups, such as Students for Justice in Palestine, as extremists, and insists that a call for "the liberation of Palestine from the River to the Sea" is antisemitic.

211. Upon information and belief, while claiming to be a training on antisemitism, the training focuses solely on false, racist, bias, and discriminatory claims about Muslims, Islam, and the movement for Palestinian liberation, a movement that is diverse and fortresses support from all sectors of global society, including people of the Jewish faith.

212. Upon information and belief, the training declares the Kuffiyeh, a traditional headdress worn by men from parts of the Middle East, as a symbol of antisemitism.

213. However, the Kuffiyeh is a scarf with patterns representing Palestinian history and culture. The dark black strips on the edges represent the historical trade routes through Palestine. The fishnet-like pattern is a reference to Palestinians' connection to the Mediterranean Sea. Lastly,

the curved lines reflect olive trees, a symbol of Palestinian heritage and a main export product of the land. The Kuffiyeh has been worn by Palestinians for generations, long before the creation of the State of Israel.

214. Upon information and belief, the training further declares that a watermelon is a symbol of antisemitism. In reality, Palestinians adopted the watermelon in response to Israel banning the display or possession of the Palestinian flag, since it presented the same colors – Red, Green, White, and Black.[51]

215. Upon information and belief, perhaps most absurdly, the training also declares that the use of "red hands"—a symbol for having blood on one's hands, or for being responsible for the murder of civilians, is antisemitic.

216. Upon information and belief, the training also declares the following phrases to be antisemitic:

a. "From the River to the Sea, Palestine Will be Free;"

b. "There is only one solution, Intifada Revolution, Globalize the Intifada;"

c. "All Eyes on Rafah;" All Eyes on Rafah is a slogan that was popularized on social media in early 2024, "meant as a request for bystanders to not look away from what's happening in the city of Rafah—where as many as 1.4 million people are sheltering after fleeing from violent fighting elsewhere in Gaza—as Israel continues its offensive despite the large civilian population." The slogan stems from a comment by the Director of the World Health Organization in response to Israeli

---

[51] Anna Furman, "How Watermelon Imagery, a symbol of solidarity with Palestinians, spread around the planet" Associated Press, Jan 18, 2024, available at https://apnews.com/article/israel-palestinians-gaza-watermelon-symbol-protests-832c9a21b82015356f0ef99d17df2633

38

Prime Minister Benjamin Netanyahu's evacuation order for the city's entire population.[52]

    d.  "Zionism is Racism;" and

    e.  "Settler Colonialism."

217.    Upon information and belief, members of the NYPD are directed to use the examples of antisemitism in the training, train officers on said symbols, publicly condemn antisemitism, and prosecute accordingly.

## CLASS REPRESENTATIVES' EXPERIENCES

218.    At all times relevant herein, all Class Representatives were assaulted and/or arrested while they were engaged in First Amendment protected activity.

**Moné Makkawi's experience on May 3, 2024.**

219.    Plaintiff Moné Makkawi is a 32-year-old New Yorker who holds a doctorate degree in Middle Eastern Studies from New York University ("NYU").

220.    On May 3, 2024, Ms. Makkawi attended a protest where students demanded that their respective universities divest from the Israeli genocide in Gaza.

221.    At approximately 5:30 p.m., the protest stopped in front of The New School, located at the intersection of 5th Avenue and East 16th Street in Manhattan.

222.    Soon thereafter, Defendant Beaudette directed Defendant members of the SRG, including Defendant Thornton, to arrest Ms. Makkawi.

223.    Defendant Thornton pulled Ms. Makkawi by her left arm and threw her onto the asphalt, pushing her face into the ground.

---

[52] Mary Whitfill Roeloffs, "'All Eyes On Rafah' Slogan Spreads On Social Media: What To Know About Its Origins" Forbes Magazine, May 28, 2024, available at https://www.forbes.com/sites/maryroeloffs/2024/05/28/all-eyes-on-rafah-slogan-spreads-on-social-media-what-to-know-about-its-origins/.

224. At least Defendant Thornton used the weight of his body to push Ms. Makkawi to the ground and then pulled Ms. Makkawi's hands behind her back to handcuff her.

225. Defendant Thornton and Defendant Doe 1, who appeared to be a large 6' tall, white man who was a member of the NYPD's SRG unit, then forcefully pulled Ms. Makkawi up by her wrists

226. Ms. Makkawi is a very petite woman who is under 5' tall.

227. Defendant Thornton and Defendant Doe 1 pulled Ms. Makkawi's handcuffed arms tightly behind her back, at an angle such that they were lifted above their natural position, injuring Ms. Makkawi's shoulders.

228. Defendant Thornton and Defendant Doe 1 dragged Ms. Makkawi backwards by her arms to a police van.

229. Ms. Makkawi was forced to endure the excessively tight handcuffs for approximately two hours until NYPD members placed her in a holding cell at One Police Plaza and finally removed her handcuffs.

230. Later that evening, Defendant Thornton issued Ms. Makkawi a Desk Appearance Ticket, bearing Arrest No. M24622106, listing a violation of New York Penal Law 195.05, "Obstruction of Governmental Administration."

231. Upon information and belief, that Desk Appearance Ticket relied on evidence, fabricated by NYPD members, about purported observations of Ms. Makkawi's alleged pre-arrest conduct.

232. The New York County District Attorney's Office declined to prosecute that charge against Ms. Makkawi.

233. As a result of Defendants' assault of Ms. Makkawi, Ms. Makkawi suffered injury to wrists, a scrape on her forehead, injury to her head, and injury to her left wrist and elbow.

234. As a result of Defendants' acts and omissions, Defendants deprived Plaintiff Makkawi of her federal, state, and/or other legal rights; caused Plaintiff Makkawi bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused Plaintiff Makkawi to expend costs and expenses; and/or otherwise damaged and injured Plaintiff.

235. The unlawful conduct of the Defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

**Moné Makkawi's experience on May 18, 2024.**

236. On May 18, 2024, at about 6:00 p.m., Ms. Makkawi was lawfully present at or near 77th Street and 4th Avenue in Kings County.

237. Ms. Makkawi was attending a demonstration in support of Palestinian rights.

238. Ms. Makkawi was standing on a sidewalk.

239. At this time, Defendants NYPD Lieutenant Michael Butler (Tax Registration No. 948725) and NYPD Member Does 2-7 arrived.

240. Ms. Makkawi was not engaged in any unlawful or suspicious activity.

241. Despite the absence of any wrongdoing, Defendants approached Ms. Makkawi, lunged at her, and began shoving and pushing her.

242. Defendants then threw and shoved Ms. Makkawi to the ground, causing some Defendants to fall on top of Ms. Makkawi.

243. Defendants held Ms. Makkawi's head to the pavement, and Defendant Butler held Ms. Makkawi down with his full body weight and pushed his knee into Ms. Makkawi.

244.     Ms. Makkawi was not involved in any violent or threatening behavior and there was no reason for the Defendants to use any level of force against Ms. Makkawi, much less the force actually used.

245.     Defendants, including possibly Defendant Butler, applied plastic handcuffs to Ms. Makkawi's wrists with extreme tightness and placed her hands on top of each other, rather than side by side, causing severe discomfort and injury to Ms. Makkawi.

246.     Ms. Makkawi complained about the excessive tightness of the handcuffs to the Defendants, but the Defendants did not take any steps to alleviate the excessive tightness of the handcuffs until after Ms. Makkawi was forced to endure the excessively tight handcuffs for an extended period of time.

247.     Ms. Makkawi was brought to One Police Plaza for arrest processing.

248.     As a result, that arrest processing unjustifiably and unreasonably lengthened Ms. Makkawi's detention; curtailed and prevented her from exercising her rights to speech, association, and assembly, and to petition the government; cast a chill on Ms. Makkawi's desire to participate in such protected expression in the future; and otherwise injured and damaged Ms. Makkawi.

249.     Some of Ms. Makkawi's property was damaged and destroyed, including Ms. Makkawi's shoes and clothing.

250.     As a result of Defendants' excessive force, Ms. Makkawi sustained injuries to her right hand, shoulder, and both wrists.

251.     Subsequently, Defendant Michael G. Butler issued Ms. Makkawi two Summonses and released her from custody.

252.     The Summonses charging Ms. Makkawi bear the Summons Numbers 4449297524 and 4449297541 and are sworn out by Defendant Butler.

253.     In the Summonses, Defendant Butler falsely alleged that Ms. Makkawi was engaged in disorderly conduct and had violated VTL Section 1156 by being in the roadway.

254.     Defendant Butler issued these summonses to Ms. Makkawi because of her participation at the demonstration in support of Palestinian rights.

255.     Ms. Makkawi's charges were eventually dismissed in her favor on grounds consistent with her innocence when she received an ACD.

256.     As a result of Defendants' acts and omissions, Defendants deprived Plaintiff Makkawi of her federal, state, and/or other legal rights; caused Plaintiff bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused Plaintiff Makkawi to expend costs and expenses; and/or otherwise damaged and injured Plaintiff Makkawi.

257.     The unlawful conduct of the Defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

**Rohaan Gill's experience on May 18, 2024.**

258.     On May 18, 2024 at approximately 5:00 p.m., Plaintiff Rohaan Gill was lawfully present at or near the intersection of 5th Avenue and 67th Street in Bay Ridge, Brooklyn.

259.     Mr. Gill was attending a demonstration in support of Palestinian rights.

260.     At this time, Defendant Talha Ahmad began using his baton to push Mr. Gill off the sidewalk and into the street.

261.     Defendant Ahmad attempted to grab Mr. Gill's shoulders as he was also pushing Mr. Gill into the street, and Defendant Omar Delarosa (Shield No. 6614) ran towards Mr. Gill with his baton, which he used to strike Mr. Gill in the head.

262.     Defendant Delarosa wore an NYPD helmet prominently displaying number 9552. Defendant Delarosa's shield number was 6614.

263.    Defendants Ahmad and Delarosa then pushed Mr. Gill into a parked car and arrested him.

264.    Mr. Gill was not engaged in any illegal or suspicious activity and there was no reason for the Defendants to approach and arrest Mr. Gill.

265.    Mr. Gill was not engaged in any violent or threatening behavior and there was no justification for the Defendants to use any level of force on Mr. Gill, much less the level of force that was actually used.

266.    Defendants Ahmad and Delarosa applied plastic handcuffs to Mr. Gill's wrists with extreme tightness.

267.    Mr. Gill complained about the excessive tightness of the handcuffs, but Defendants Ahmad and Delarosa did not take any steps to alleviate the excessive tightness of the handcuffs until after Mr. Gill was forced to endure the excessively tight handcuffs for an extended period of time.

268.    Rather than issuing Mr. Gill a summons or other legal process on the street, Defendants Ahmad and Delarosa loaded Mr. Gill into a prisoner transport vehicle and took Mr. Gill to a centralized arrest processing location believed to be One Police Plaza.

269.    As a result, that arrest processing unjustifiably and unreasonably lengthened Mr. Gill's detention; curtailed and prevented Mr. Gill from exercising Mr. Gill's rights to speech, association, and assembly, and to petition the government; cast a chill on Mr. Gill's desire to participate in such protected expression in the future; and otherwise injured and damaged Mr. Gill.

270.    NYPD members unlawfully searched Mr. Gill's person.

271.    NYPD members unlawfully seized Mr. Gill's property.

272.    During Mr. Gill's time in custody, no NYPD member offered Mr. Gill a phone call.

273. Upon information and belief, Defendant Ahmad created official NYPD paperwork relying on fabricated evidence, including about purported observations of Mr. Gill's alleged pre-arrest conduct, and/or forwarded such fabricated evidence to prosecutors and/or initiated charges against Mr. Gill, relying on fabricated evidence and without probable cause.

274. At approximately 2 a.m. on May 19, 2024, Officer Ahmad issued Mr. Gill a Desk Appearance Ticket and released Mr. Gill from custody.

275. Defendant Ahmad also swore out a criminal complaint where Defendant Ahmad swore out false allegations against Mr. Gill falsely charging him with Attempted Grand Larceny in the Fourth Degree, Obstructing Governmental Administration in the Second Degree, Resisting Arrest and Attempted Petit Larceny.

276. Mr. Gill was forced to make three court appearances pursuant to Defendant Ahmad's false allegations.

277. On October 11, 2024, Mr. Gill's charges were dismissed.

278. As described above, Mr. Gill sustained injuries to his physical and emotional wellbeing, as well as violations of his constitutional, common law, and statutory rights.

279. Those injuries include but are not limited to: pain and injury to Mr. Gill's head and wrists.

280. As a result of Defendants' acts and omissions, Defendants deprived Plaintiff Mr. Gill of his federal, state, and/or other legal rights; caused Plaintiff Mr. Gill bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused Plaintiff Mr. Gill to expend costs and expenses; and/or otherwise damaged and injured Plaintiff Mr. Gill.

281. The unlawful conduct of the Defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

**Loay Elasmar's experience on May 18, 2024.**

282.     On May 18, 2024, at about 4:00 p.m., Plaintiff, Loay Elasmar was lawfully present at or near 5th Avenue and Bay Ridge Avenue, in Kings County, City and State of New York, when multiple New York City Police Department ("NYPD") members, *inter alia,* unlawfully assaulted, seized, battered, and arrested Plaintiff, employing unreasonable and excessive force, in violation of, and retaliation for the exercise of, Plaintiff's rights to free speech and assembly, and other rights.

283.     Mr. Elasmar was attending a demonstration in support of Palestinian rights.

284.     Without any probable cause or reasonable justification, Defendant NYPD Detective Brian Greig (Shield No. 3374) approached Mr. Elasmar and body slammed him into a pole, subsequently throwing him to the ground.

285.     Another NYPD member, Defendant NYPD Sergeant Andonios Constantatos (Shield No. 1640), held Mr. Elasmar down and repeatedly hit and punched him on his body including on his back and thigh, while NYPD Member Doe 8 failed to intervene in Defendant Constantatos' use of excessive force.

286.     The name of NYPD Member Doe 8 is currently unknown to Mr. Elasmar but the officer was wearing an NYPD uniform with a white shirt.[53]

287.     Mr. Elasmar was not engaged in any violent or threatening behavior and there was no reason for the Defendants to use any force against Mr. Elasmar, much less the force actually employed.

---

[53] NYPD members wearing white button-down shirts as part of their uniform do so as a mark of being a Lieutenant or above — that is, they are command-level members of the NYPD.  Colloquially, members of the NYPD use "white shirt" as a shorthand for command-level members of the NYPD because of this uniform style.  And accordingly, this complaint identifies unknown members of the NYPD as wearing white shirts when relevant as both a detail useful to identify them as well as a detail that informs their role and responsibilities in the facts alleged.

288.    Mr. Elasmar was not engaged in any illegal or suspicious activity and there was no probable cause or legal justification for the Defendants to arrest him.

289.    Despite the absence of any wrongdoing by Mr. Elasmer, Defendants handcuffed Mr. Elasmer excessively tightly using metal handcuffs.

290.    Mr. Elasmar complained about the excessive tightness of the handcuffs and/or it was obvious to the Defendants that the handcuffs were too tight, but the Defendants who knew or should have known that the handcuffs were too tight did not take any steps to alleviate the excessive tightness of the handcuffs until after Mr. Elasmar was forced to endure the excessively tight handcuffs for an extended period of time.

291.    Rather than issuing Mr. Elasmar a summons or other legal process on the street, Defendants loaded him into a prisoner transport vehicle and took him to a centralized arrest processing location.

292.    As a result, that arrest processing unjustifiably and unreasonably lengthened Mr. Elasmar's detention; curtailed and prevented Mr. Elasmar from exercising his rights to speech, association, and assembly, and to petition the government; cast a chill on Mr. Elasmar's desire to participate in such protected expression in the future; and otherwise injured and damaged Mr. Elasmar.

293.    NYPD members unlawfully searched Mr. Elasmar's person.

294.    NYPD members unlawfully seized Mr. Elasmar's property.

295.    Some of Mr. Elasmar's property was significantly damaged.

296.    During Plaintiff's time in custody, no NYPD member offered Mr. Elasmar a phone call. And, as the arrest processing procedures the NYPD applied to Mr. Elasmar's arrest because it was made in connection with a protest did not allow for legal counsel or anyone else to contact

Mr. Elasmar, or communicate with NYPD officers about Mr. Elasmar's arrest or arrest processing status, no one could locate or contact Mr. Elasmar while he was in custody.

297. Mr. Elasmar requested bandages to clean up his wounds, but the NYPD member to whom he made the request did not provide bandages, nor did he do anything to help Mr. Elasmar.

298. Upon information and belief, members of the NYPD created official NYPD paperwork relying on fabricated evidence, including about purported observations of Mr. Elasmar's alleged pre-arrest conduct, and/or forwarded such fabricated evidence to prosecutors and/or initiated charges against Mr. Elasmar, relying on fabricated evidence and without probable cause.

299. Approximately three hours after Defendant Greig attacked Mr. Elasmar, on May 18, 2024, Defendant Greig issued Mr. Elasmar a Summons and released him from custody.

300. The Summons charging Mr. Elasmar bears the Summons Number 4453550103 and is sworn out by Defendant Greig.

301. In the Summons, Defendant Greig falsely alleged that Mr. Elasmar was engaged in disorderly conduct.

302. Subsequently, Mr. Elasmar's charges were dismissed.

303. Mr. Elasmar's physical injuries include, but are not limited to the following: pain and abrasions to his head, forehead, cheek, right hand, and shoulders; a scar on his right hand; pain to his neck, thighs.

304. As a result of Defendants' acts and omissions, Defendants deprived Plaintiff Mr. Elasmar of his federal, state, and/or other legal rights; caused Plaintiff Mr. Elasmar bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused Plaintiff Mr.

Elasmar to expend costs and expenses; and/or otherwise damaged and injured Plaintiff Mr. Elasmar.

305.    The unlawful conduct of the Defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

**Miguel Figueroa's experience on May 18, 2024.**

306.    On May 18, 2024 at approximately 5:00 p.m., Plaintiff Miguel Figueroa was lawfully present in front of or near 271 Bay Ridge Avenue in Kings County.

307.    Mr. Figueroa was attending a demonstration in support of Palestinian rights.

308.    Mr. Figueroa was taking photos of Defendant NYPD Deputy Chief Jesse Lance (Tax Registration No. 923789)'s shirt, as he observed that Defendant Lance's shirt had blood on it from a protestor Defendant Lance had just brutalized.

309.    At this time, members of the NYPD including Defendant Lance and NYPD Lieutenant Butler (Tax Registration No. 948725) began attacking Mr. Figueroa by grabbing Mr. Figueroa, throwing him to the ground causing him to hit his head, and by dragging him across the pavement.

310.    Defendant Butler attempted to grab the hand Mr. Figueroa was holding his phone in, and knocked Mr. Figueroa's phone out of his hand.

311.    NYPD members left Mr. Figueroa's phone on the street.

312.    Defendant Lance was previously sued in *Kedwin Payamps v. The City of New York, et al.*, 22 CV 563 (AMD)(VMS) for excessive force against a protestor when Defendant Lance was an inspector.

313.    In that case, on June 4, 2020, Defendant Lance struck Mr. Payamps's bike with his baton and struck Mr. Payamps with his asp or baton, during a lawful protest where Mr. Payamps was merely a bystander on his way home from visiting his mother.

314.    Related to Mr. Payamps's incident, the CCRB opened an investigation into the conduct of Defendant Lance.

315.    Defendant Lance gave invented and wholly false statements about his conduct to the CCRB.

316.    The CCRB substantiated complaints against Defendant Lance.

317.    Since that prior incident, Defendant Lance has received no consequences for his violent actions towards protesters, and has been promoted by the NYPD.

318.    Defendant Grant and NYPD Member Does 9-10 joined in Defendant Butler's attack, and Defendant Lance stood by and did nothing to intervene on Mr. Figueroa's behalf despite the fact that he had the opportunity to do so.

319.    Mr. Figueroa is not currently aware of the names of Defendant NYPD Member Does 9-10, but they appeared to be men in blue NYPD uniforms wearing helmets with face shields.

320.    Mr. Figueroa was not involved in any violent or threatening behavior and there was no reason for the Defendants to use any level of force against him much less the force actually employed.

321.    Defendants applied excessively tight plastic ziptie handcuffs to Mr. Figueroa.

322.    Mr. Figueroa complained about the excessive tightness of the handcuffs and/or it was obvious to the Defendants that the handcuffs were too tight, but the Defendants who knew or should have known that the handcuffs were too tight did not take any steps to alleviate the

excessive tightness of the handcuffs until after Mr. Figueroa was forced to endure the excessively tight handcuffs for an extended period of time.

323.    Rather than issuing Mr. Figueroa a summons or other legal process on the street, Defendants, including NYPD Member Does 9-10 loaded Mr. Figueroa into a prisoner transport vehicle and took Mr. Figueroa to a centralized arrest processing location.

324.    Because Defendants arrested Mr. Figueroa in connection with a protest, they subjected Mr. Figueroa to unreasonable and lengthy NYPD large-scale arrest processing, to which other similarly situated people detained by the NYPD for the same offense(s) with which Plaintiffs outside of the protest context are not subjected.

325.    As a result, that arrest processing unjustifiably and unreasonably lengthened Mr. Figueroa's detention; curtailed and prevented Mr. Figueroa from exercising his rights to speech, association, and assembly, and to petition the government; cast a chill on Mr. Figueroa's desire to participate in such protected expression in the future; and otherwise injured and damaged Mr. Figueroa.

326.    NYPD members unlawfully searched Mr. Figueroa's person.

327.    NYPD members unlawfully seized Mr. Figueroa 's property.

328.    Some of Mr. Figueroa's property was significantly damaged.

329.    During Mr. Figueroa's time in custody, no NYPD member offered Mr. Figueroa a phone call.

330.    Mr. Figueroa was brought to One Police Plaza for arrest processing.

331.    Upon information and belief, members of the NYPD created official NYPD paperwork relying on fabricated evidence, including about purported observations of Mr. Figueroa's alleged pre-arrest conduct, and/or forwarded such fabricated evidence to prosecutors

and/or initiated charges against Mr. Figueroa, relying on fabricated evidence and without probable cause.

332.    At approximately 2:00 a.m. on May 19, 2024, Defendant Butler issued Mr. Figueroa 2 Summonses and released Mr. Figueroa from custody.

333.    The Summonses charging Mr. Figueroa, which bear the Summons Numbers 4449297538 and 4450226275, are sworn out by Defendant Butler.

334.    In the Summonses, Defendant Butler falsely alleged that Mr. Figueroa was engaged in disorderly conduct and had violated VTL Section 1156 by being in the roadway.

335.    Mr. Figueroa's charges were subsequently dismissed.

336.    Mr. Figueroa's physical injuries include, but are not limited to the following: pain and injury to his head, forearms, elbow, and wrists.

337.    As a result of Defendants' acts and omissions, Defendants deprived Plaintiff Mr. Figueroa of his federal, state, and/or other legal rights; caused Plaintiff Mr. Figueroa bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused Plaintiff Mr. Figueroa to expend costs and expenses; and/or otherwise damaged and injured Plaintiff Mr. Figueroa.

338.    The unlawful conduct of the Defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

**Ahmed Elsayed's experience on May 11, 2024.**

339.    Plaintiff Ahmed Elsayed is a 59-year-old father of five children.

340.    On May 11, 2024, Mr. Elsayed was attending a demonstration in support of Palestinian rights outside the Barclays Center in Brooklyn, NY with his daughter and her friend.

341.    Mr. Elsayed planned to meet up with his wife and her friends at the same protest.

342.     As Ahmed, his daughter and her friend were looking for his wife, they stepped off the sidewalk and onto the cross walk to get to the other side of the street.

343.     Without warning or cause, Defendant Jane Doe 12 violently grabbed Mr. Elsayed. Mr. Elsayed was startled by this and immediately asked her what happened and why he was being detained.

344.     Defendant Jane Doe 12 shoved Mr. Elsayed and let him go.

345.     Mr. Elsayed was back on the sidewalk and began frantically searching for his daughter and her friend.

346.     He could not find them until he realized they were both being assaulted and arrested by NYPD officers.

347.     Mr. Elsayed pleaded with officers to leave the girls alone, that they were minors, and to arrest him instead.

348.     While still on the sidewalk, Mr. Elsayed turned around and placed his hands behind his back to signal to officers that he was willing to be arrested in place of his daughter and her friend.

349.     NYPD Defendant Officer Joseph Cunningham immediately pounced on Mr. Elsayed, dragged him off of the sidewalk, threw him to the ground, broke his glasses and ripped his shirt.

350.     Mr. Elsayed laid beneath NYPD officers, including Defendant Cunningham feeling scared, confused, and humiliated.

351.     NYPD members, including Defendant Cunningham, snatched Mr. Elsayed off the ground and shoved him towards a police van.

352.    Defendant Cunningham tightly placed Mr. Elsayed in zip ties causing him pain to his shoulders.

353.    NYPD members still arrested his daughter and her friend without any cause or basis.

354.    The minors were detained for several hours and later released without any charges.

355.    NYPD members detained Mr. Elsayed for several hours and falsely charged him with resisting arrest.

356.    In January 2025, the Kings County District Attorney's Office finally declined to prosecute the charges against him.

357.    As a result of Defendants' acts and omissions, Defendants deprived Plaintiff Mr. Elsayed of his federal, state, and/or other legal rights; caused Plaintiff Mr. Elsayed bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused Plaintiff Mr. Elsayed to expend costs and expenses; and/or otherwise damaged and injured Plaintiff Mr. Elsayed.

358.    The unlawful conduct of the Defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

**Arib Hasan's experience on May 11, 2024.**

359.    On May 11, 2024, Mr. Hasan was attending a demonstration in support of Palestinian rights outside the Barclays Center in Brooklyn, New York.

360.    Mr. Hasan was marching on a sidewalk with several other protestors, and the atmosphere was one of sadness and great despair at the genocide unfolding in Gaza at the hands of Israel.

361.    Mr. Hasan witnessed police officers become aggressive and arrest children, elders, and people from different backgrounds.

362.    Mr. Hasan witnessed police officers yank people out from the protest and slam them onto the roadway and forcefully arrest and assault them.

363.    While on the sidewalk, Defendant John Doe 13, who appeared to be a Caucasian male between 5'6 and 5'9, yelled at Mr. Hasan to get back.

364.    Confused as to what this meant, Mr. Hasan put his hands up and took steps back further into the sidewalk.

365.    Without warning or cause, Defendant Doe 13 grabbed Mr. Hasan by the stomach and tried yanking him off of the sidewalk.

366.    Defendant Doe 13 was joined by Defendant Does 14-16 as they all grabbed Plaintiff from the sidewalk, dragged him onto the street and brutalized him.

367.    Defendant Does 13-16 slammed Mr. Hasan's face into the ground and scraped it against the street.

368.    Defendant Does 13-16 put their knees on Mr. Hasan's back and placed him in tight handcuffs, causing pain and discomfort in his hands.

369.    Although officers claimed to have loosened the zip ties, they were still tight and Mr. Hasan again begged officers to loosen the cuffs.

370.    His pleas for help were ignored.

371.    Mr. Hasan was taken to One Police Plaza where he was denied water, falsely charged with VTL 1156(a) the unlawful use of a roadway, and detained for at least eight hours.

372.    Defendant Does 13-16 injured Mr. Hasan, including but not limited to, breaking his leg.

373. Mr. Hasan has persistent pain in his lower back and his neck.

374. The charges against Mr. Hasan were dismissed in the interests of justice.

375. As a result of Defendants' actions, Mr. Hasan fears attending protests and has been diagnosed with post-traumatic stress disorder.

376. As a result of Defendants' acts and omissions, Defendants deprived Plaintiff Mr. Hasan of his federal, state, and/or other legal rights; caused Plaintiff Mr. Hasan bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused Plaintiff Mr. Hasan to expend costs and expenses; and/or otherwise damaged and injured Plaintiff Mr. Hasan.

377. The unlawful conduct of the Defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

**Carla Tejada's experience on May 11, 2024.**

378. On May 11, 2024, the day before Mother's Day, Ms. Tejada was attending a demonstration in support of Palestinian rights outside the Barclays Center in Brooklyn, New York.

379. Prior to May 11, 2024, Ms. Tejada attended many protests, none of which ever resulted in her arrest.

380. Ms. Tejada went to the protest by herself and carried a sign displaying two little girls murdered by Israel in its genocide of Gaza.

381. Ms. Tejada felt compelled to carry this sign because the two little girls who were murdered were of similar age to Ms. Tejada's daughter.

382. As Ms. Tejada was marching with the protest and chanting "Free Palestine," NYPD members charged towards the group of protesters.

383. Without warning or basis, NYPD members yelled "Get them" and several officers who were initially surrounding protestors then descended upon them.

384.    Defendant John Doe 17, who appeared to be a Caucasian male in his mid-fifties wearing a white shirt (meaning he was a supervisor), snatched Ms. Tejada and tightly grabbed her by her arms.

385.    Ms. Tejada panicked and froze out of fear.

386.    Her knees locked and she peed on herself as the white shirt officers took her to the ground.

387.    The white shirt officer then passed Ms. Tejada to another officer, Defendant John Doe 18, who placed her in zip ties.

388.    A second white shirt officer (Defendant John Doe 19) came over and held Ms. Tejada's shoulder as she was zip tied.

389.    Ms. Tejada asked Defendant Doe 19 to loosen her zip ties because they were too tight and causing her severe pain and discomfort, but she was ignored.

390.    NYPD members took Ms. Tejada to One Police Plaza, where her arrest was processed.

391.    While there, Ms. Tejada's repeated requests to make a phone call to her family were all ignored.

392.    Ms. Tejada was detained for at least eight hours and charged with disorderly conduct.

393.    All charges against Ms. Tejada were dismissed in the interests of justice.

394.    Since the assault and arrest at the hands of NYPD members, Ms. Tejada has not gone to any protest out of fear of being assaulted and arrest by police officers again.

395.    Ms. Tejada still experiences pain in her wrists, particularly when the weather is cold.

396.     As a result of Defendants' acts and omissions, Defendants deprived Plaintiff Ms. Tejada of her federal, state, and/or other legal rights; caused Plaintiff Ms. Tejada bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused Plaintiff Ms. Tejada to expend costs and expenses; and/or otherwise damaged and injured Plaintiff Ms. Tejada.

397.     The unlawful conduct of the Defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

**Benjamin Wilson's experience on May 11, 2024.**

398.     On May 11, 2024, Mx. Wilson was attending a demonstration in support of Palestinian rights at the Barclays Center in Brooklyn, New York.

399.     Mx. Wilson followed the protest towards the Manhattan bridge and entered the bridge.

400.     Dozens of officers charged towards protestors while on the Manhattan bridge and pushed the protestors, including Mx. Wilson, up against the side of the bridge.

401.     At no time did any officers give any commands or warnings to Mx. Wilson before making contact with them.

402.     Defendant Assistant Chief James McCarthy indiscriminately dispersed pepper spray upon the protestors and, in doing so, sprayed Mx. Wilson in the face.

403.     While Mx. Wilson was blinded by the pepper spray, Defendant John Doe 20 forced them to the ground and arrested them.

404.     Defendant Doe 20 placed Mx. Wilson's hands in extremely tight zip ties that cut off blood circulation to their hands.

405.     Mx. Wilson begged for medical attention due to the pepper spray deployed by NYPD Defendant Doe 20, which caused their eyes and face to sting.

406.   Mx. Wilson was left to soak in the pepper spray for at least eight hours of detention.

407.   Mx. Wilson was charged with VTL § 1156 (a) and disorderly conduct, both of which were either dismissed or never filed by the NYPD member.

408.   Upon their eventual release, Mx. Wilson tried washing off the pepper spray, but the liquid spread all over their body, causing their whole body to burn, including their private parts.

409.   As a result of Defendants' actions, Mx. Wilson suffered injuries to their face, lips, eyes, throat, chest, and private parts.

410.   As a result of Defendants' acts and omissions, Defendants deprived Plaintiff Mx. Wilson of their federal, state, and/or other legal rights; caused Plaintiff Mx. Wilson bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused Plaintiff Mx. Wilson to expend costs and expenses; and/or otherwise damaged and injured Plaintiff Mx. Wilson.

411.   The unlawful conduct of the Defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

**Ethan Wright's experience on September 26, 2024**.

412.   On September 26, 2024, at approximately 9:45 p.m., Plaintiff Ethan Wright was attending a demonstration in support of Palestinian rights at or around 40 East 62nd Street in Manhattan, New York.

413.   At this time, Defendants NYPD Members Does 21-25 rapidly approached Mr. Wright, shoved him using their batons, and pushed him to the ground multiple times.

414.   NYPD Member Doe 21 approached Mr. Wright from across a barricade and shoved Mr. Wright to the ground, causing Mr. Wright to hit his head on the pavement.

415.   Mr. Wright was unable to move as NYPD members continued to push other people nearby, causing them to fall and pile on top of Mr. Wright.

416.    Defendants NYPD Members Does 21-25 picked up Mr. Wright, roughly threw him over a barricade, then dropped him on the ground, hitting Mr. Wright's back and head against the pavement a second time, causing Mr. Wright to lose consciousness for several seconds.

417.    Defendants NYPD Members Does 21-25 then dragged Mr. Wright's limp body across the pavement and put plastic handcuffs on Mr. Wright's wrists with extreme tightness.

418.    Mr. Wright complained about the excessive tightness of the handcuffs, but the members of the NYPD to whom Mr. Wright complained did not take any steps to alleviate the excessive tightness of the handcuffs until after Mr. Wright was forced to endure the excessively tight handcuffs for an extended period of time.

419.    In addition to Defendants NYPD Members Does 21-25, multiple NYPD members, including Defendant Joahan Gomez, supervisors wearing white shirts as well as Strategic Response Group members, were present within a few feet of Defendants NYPD Members Does 21-25, as they and other NYPD members attacked and arrested Mr. Wright.

420.    NYPD members unlawfully searched Mr. Wright's person.

421.    Mr. Wright's phone was lost or destroyed during his arrest.

422.    Upon information and belief, Mr. Wright's phone fell out of his pocket when NYPD members threw him over the barricade, and Mr. Wright was not provided with any opportunity to retrieve his property.

423.    Mr. Wright was not engaged in any illegal or suspicious activity and there was no reason for the Defendants to approach and arrest Mr. Wright.

424.    Mr. Wright was not engaged in any violent or threatening behavior and there was no justification for the Defendants to use any level of force on Mr. Wright, much less the level of force that was actually used.

425. Mr. Wright requested medical attention a few minutes after being placed under arrest, however NYPD members unreasonably delayed providing such attention to Mr. Wright.

426. Mr. Wright waited over an hour to receive medical attention, during which time Mr. Wright lost consciousness multiple times.

427. Mr. Wright was seen by EMT's on site, before being loaded into an ambulance and transported to the emergency department at Mount Sinai West Hospital.

428. Upon information and belief, Defendant Gomez created official NYPD paperwork relying on fabricated evidence, and/or initiated charges Blocking Pedestrian Traffic and Refusal to Disperse, relying on fabricated evidence and without probable cause.

429. At approximately 11:00 p.m. on September 26, 2024, Defendant Gomez issued two summonses to Mr. Wright, which bear the summons numbers 4452553319 and 4452553322.

430. On October 16, 2024, the resulting criminal proceedings against Mr. Wright were dismissed because the NYPD failed to file legally sufficient accusatory instruments, consistent with Mr. Wright's innocence.

431. As described above, Defendants' conduct directly and proximately caused physical injuries to Mr. Wright, including but not limited to: a concussion, post-concussive syndrome symptoms, and pain and injury to his right wrist.

432. Defendants' conduct also directly and proximately caused Mr. Wright to suffer disruptions to his daily activities due to ongoing post-concussive syndrome symptoms.

**Malik Salti's experience on May 8, 2025:**

433. Plaintiff Malik Salti is a 22 year-old CUNY student of Palestinian descent.

434. On May 8, 2025 at approximately 6:00 p.m., Plaintiff Malik Salti was lawfully present on the sidewalk near 2901 Campus Road, Flatbush, Brooklyn.

435.    Mr. Salti was attending a protest in support of Palestinian rights, which began at CUNY's Brooklyn College.

436.    At that time, Mr. Salti was listening to another student give a speech to the crowd of protestors.

437.    Mr. Salti then witnessed defendant members of the NYPD suddenly storm the crowd of protesting students—who were standing lawfully on the sidewalk—with no warning.

438.    Mr. Salti watched NYPD members grabbing and assaulting protestors at random.

439.    Mr. Salti began recording.

440.    Defendant NYPD Lieutenant Ricardo Lawrence and Defendant NYPD Officer Hiram J Velez violently grabbed Mr. Salti by the neck and pulled him down to the ground.

441.    NYPD members assaulted and pushed protestors in every direction around Mr. Salti, and Defendants Lawrence and Velez pushed Mr. Salti onto the ground, on top of other protestors.

442.    As Mr. Salti crouched on the ground, Defendant Velez pressed the weight of his body on top of Mr. Salti's.

443.    As a result of the sheer force used to arrest Mr. Salti, he was knocked out of his sneakers.

444.    Defendant Velez then lifted Mr. Salti up and pulled him across the street towards a parked police vehicle.

445.    As they neared the vehicle, Defendant Velez recklessly spun Mr. Salti around and then slammed Mr. Salti's head into the top of the car as he pushed Mr. Salti inside.

446.    Mr. Salti was not engaged in any illegal or suspicious activity and there was no reason for the Defendants to approach and arrest Mr. Salti.

447. Mr. Salti was not engaged in any violent or threatening behavior and there was no justification for the Defendants to use any level of force on Mr. Salti, much less the level of force that was actually used.

448. Rather than issuing Mr. Salti a summons or other legal process on the street, Defendants loaded Mr. Salti into a prisoner transport vehicle and took Mr. Salti to a police station, where he was detained for several hours.

449. Because Defendants arrested Mr. Salti in connection with a protest, they subjected Mr. Salti to unreasonable and lengthy NYPD large-scale arrest processing, to which other similarly situated people detained by the NYPD for the same offense(s) with which Mr. Salti was charged outside of the protest context are not subjected.

450. As a result, that arrest processing unjustifiably and unreasonably lengthened Mr. Salti's detention; curtailed and prevented Mr. Salti from exercising his rights to speech, association, and assembly, and to petition the government; cast a chill on Mr. Salti's desire to participate in such protected expression in the future; and otherwise injured and damaged Mr. Salti.

451. NYPD members unlawfully searched Mr. Salti's person.

452. During Mr. Salti's time in custody, no NYPD member offered Mr. Salti a phone call.

453. Upon information and belief, Defendant NYPD members created official NYPD paperwork relying on fabricated evidence, including about purported observations of Mr. Salti's alleged pre-arrest conduct, without probable cause.

454. At approximately 10 or 11 p.m. on May 8, 2025, an unknown NYPD member issued Mr. Salti a summons, bearing summons number 4453554086, and released Mr. Salti from custody.

455. The summons charged Claimant with Disorderly Conduct under New York Penal Law §240 20(6).

456. When Mr. Salti appeared in court on May 27, 2025, he learned that the summons was deemed defective and therefore dismissed.

457. As a result of Defendants' acts and omissions, Defendants deprived Plaintiff Mr. Salti of his federal, state, and/or other legal rights; caused Plaintiff Mr. Salti bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused Plaintiff Mr. Salti to expend costs and expenses; and/or otherwise damaged and injured Plaintiff Mr. Salti.

458. The unlawful conduct of the Defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

**Bryan Vivas's experience on May 8, 2025**

459. On May 8, 2025 at approximately 6:00 p.m., Plaintiff Bryan Vivas was lawfully near 2901 Campus Road, Flatbush, Brooklyn.

460. Mr. Vivas was attending a demonstration in support of Palestinian rights.

461. The protestors were non-violent.

462. Suddenly, without any provocation or justification, Defendant NYPD Lieutenant Ricardo Lawrence waded into the crowd and began grabbing protestors and throwing them to the ground.

463. Upon information and belief, Defendant Lawrence directed NYPD members to begin arresting protestors.

464. At that time, an unknown NYPD member shoved Mr. Vivas backwards.

465. Then, Defendant Steven Li and other unknown NYPD members grabbed Plaintiff.

466.     Mr. Vivas was not engaged in any illegal or suspicious activity and there was no reason for the Defendants to approach and arrest Mr. Vivas.

467.     While multiple NYPD members held Mr. Vivas's arms and hands, Defendant Li then tased Mr. Vivas multiple times.

468.     Upon information and belief, Defendant Li hit Mr. Vivas with two taser cartridges.

469.     Defendant Li then struck Mr. Vivas with the taser in "drive-stun" mode.

470.     Defendant Li tased Mr. Vivas even though he was already subdued and under the control of NYPD members.

471.     Mr. Vivas was not engaged in any violent or threatening behavior and there was no justification for Defendants to use any level of force on Mr. Vivas, much less the level of force that was actually used.

472.     Defendant Li then arrested Mr. Vivas.

473.     Defendant Li applied handcuffs to Mr. Vivas with extreme tightness.

474.     Because Defendant Li arrested Mr. Vivas in connection with a protest, he subjected Mr. Vivas to unreasonable and lengthy NYPD large-scale arrest processing, to which other similarly situated people detained by the NYPD for the same offense(s) with which Mr. Vivas was charged outside of the protest context are not subjected.

475.     As a result, that arrest processing unjustifiably and unreasonably lengthened Mr. Vivas's detention; curtailed and prevented Mr. Vivas from exercising Mr. Vivas's rights to speech, association, and assembly, and to petition the government; cast a chill on Mr. Vivas's desire to participate in such protected expression in the future; and otherwise, injured and damaged Mr. Vivas.

476.     NYPD members unlawfully searched Mr. Vivas's person.

477.    During Mr. Vivas's time in custody, no NYPD member offered Mr. Vivas a phone call.

478.    Upon information and belief, Defendant Li created official NYPD paperwork relying on fabricated evidence, including about purported observations of Mr. Vivas's alleged pre-arrest conduct, and/or forwarded such fabricated evidence to prosecutors and/or initiated charges against Mr. Vivas, relying on fabricated evidence and without probable cause.

479.    At approximately 12:30 am. on May 9, 2025, Defendant Li issued Mr. Vivas a Desk Appearance Ticket and released Mr. Vivas from custody.

480.    Defendant Li swore out false allegations against Mr. Vivas falsely charging him with Obstructing Governmental Administration in the Second Degree and Resisting Arrest.

481.    As a result of Defendants' acts and omissions, Defendants deprived Plaintiff Mr. Vivas of his federal, state, and/or other legal rights; caused Plaintiff Mr. Vivas bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused Plaintiff Mr. Vivas to expend costs and expenses; and/or otherwise damaged and injured Plaintiff Mr. Vivas.

482.    The unlawful conduct of the Defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

## CLASS ACTION ALLEGATIONS

483.    Pursuant to Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, Plaintiffs MONÉ MAKKAWI, ROHAAN GILL, LOAY ELASMAR, MIGUEL FIGUEROA, AHMED ELSAYED, ARIB HASAN, CARLA TEJADA, BENJAMIN WILSON, ETHAN WRIGHT, MALIK SALTI, and BRYAN VIVAS seek to represent a certified Plaintiff class consisting of:

    a.    all persons present at the time of any protest on the subject of Palestinian rights (construed broadly) ("Protest" or "Protests") that took place within the five

boroughs of NYC between October 21, 2023 and ongoing[54], who were, among other things:

1. arrested;
2. detained in any fashion, without custodial arrest;
3. subjected to any force;
4. faced any police action that might have or did have a chilling effect; or
5. were otherwise subjected to, without any limitation, any of the policies, practices, and customs alleged elsewhere in this complaint.

For the lack of ambiguity, this includes persons who were subjected to any conduct by employees, agents, or other actors associated with or acting on behalf of the City, whether that action was:

1. as part of enforcement action directed at the Protest itself;
2. because of physical proximity to the Protest;
3. because of perceived association with the Protest;
4. because of observation of the Protest, or any attempt or perceived attempt to document NYPD conduct during the Protest in any fashion;
5. otherwise because of any connection whatsoever to the Protest.

b. all persons, who, during any Protest, were subjected to the arrest processing policies, practices, and customs alleged herein. For the lack of ambiguity, this includes persons who were subjected to any conduct by employees, agents, or other actors associated with or acting on behalf of the City, whether that action was:

1. as part of enforcement action directed at the Protest itself;
2. because of physical proximity to the Protest;
3. because of perceived association with the Protest;
4. because of observation of the Protest, or any attempt or perceived attempt to document NYPD conduct during the Protest in any fashion;
5. otherwise because of any connection whatsoever to the Protest.

Finally, the Class shall exclude:

1. anyone employed by counsel for Defendants in this action;
2. any Judge to whom this case is assigned, as well as their immediate family and staff;
3. Any person who meets the above criteria, but who was arrested or assaulted specifically on a college-owned campus; and
4. Members of the proposed Class in *Steadman v. City of New York*, 25-cv-4081 (EDNY).

---

[54] This proposed class definition excludes the class plead in *Steadman, et al, v. City of New York, et al*., 25-cv-04081 (E.D.N.Y.).

484. Plaintiff Class Representatives raise claims that are common to those possessed by all members of the class who are too numerous to be practically joined as individuals in this lawsuit.

485. In addition, joinder is impractical because, upon information and belief, some members of the Class are not, or will not be, aware of the fact that their constitutional and statutory rights have been violated and that they have the right to seek redress in court. Upon information and belief, many members of the class are or will be without the means to retain an attorney to represent them in a civil rights lawsuit.

486. The common questions of fact and law predominate over individual ones that may be dissimilar between class members.

487. These common questions of fact and law all flow from the same policies, enacted and implemented by the named and unnamed Defendants. The Defendant City's city-wide policies, practices, and customs effectuated at the protests described herein were a result of a unitary scheme in which Defendants violated the constitutional rights of Class Members. The Class Representatives and all Class Members were and will be victimized by these same retaliatory policies of arresting protestors without legal justification in violation of, *inter alia*, the First, Fourth and Fourteenth Amendments of the United States Constitution, and the New York State Constitution, and thus the foregoing common questions of law and fact greatly predominate over questions affecting only individual members, including legal and factual issues relating to damages.

488. Judicial efficiency and economy will be furthered by recognizing this as a class action.

489. Class Representatives have no interests dissimilar from class members.

490.     The claims raised by Class Representatives are also typical of the legal claims possessed by the other class members, in that at the time the Class Representatives' constitutional rights were violated, they were engaging and/or attempting to engage in activities protected by the First Amendment or were simply observing and/or recording or in the vicinity of such conduct as bystanders. The Class Representatives were the victims of Defendants' policies of assaulting and/or arresting groups of individuals engaged in lawful political protest and/or mere observation of said protest without individualized determinations of probable cause, and indeed without probable cause in general. The Class Representatives were the victims of excessive and unreasonable force in the course of these unconstitutional arrests and, following their arrests, were detained under conditions that were unreasonable, inhumane, excessive and punitive, all in violation of the First, Fourth and Fourteenth Amendments to the United States Constitution and the Constitution and laws of the State of New York.

491.     The legal claims for which Class Representatives seek declaratory and injunctive relief are the same as or similar to those on which all members of the Class will rely, and the harms suffered by the Class Representatives are typical of the harms suffered by the class members.

492.     Class Representatives have a strong personal interest in the outcome of this action, have no conflicts of interest with members of the Class, and will fairly and adequately protect the interests of the Class.

493.     Moreover, many Class Representatives and Class Members continue to regularly participate in Palestine Protests, where Defendants' unconstitutional policies, practices and/or customs are implemented, and therefore remain at high risk of being unconstitutionally harmed in the future pursuant to these policies, practices and customs as they wish to participate in future protests.

494. Class Representatives are adequate to serve in this role because they were assaulted and/or arrested without legal justification while attending or observing Palestine Protests.

495. Class Representatives who were arrested had their summonses or other charging instruments later dismissed, and they were subjected to Defendants' Protest Arrest Processing Policies.

496. Plaintiffs are also typical of the members of the Class.

497. Like other members of the Class, Class Representatives were subject to assault and/or arrest in violation of their First Amendment rights, excessive use of force, and unconditional conditions of confinement at Palestine Protests.

498. Class Representatives are represented by Cohen & Green PLLC ("C&G"), Gideon Orion Oliver, Esq. ("Mr. Oliver"), Massimi Law PLLC ("Ms. Massimi"), The Aboushi Law Firm PLLC ("Ms. Aboushi"), Beldock Levine & Hoffman LLP ("BLH"), The Fu Firm PLLC ("Mr. Fu"), and Gibson Law Firm PLLC ("Ms. Gibson").

499. C&G attorneys have litigated a number of class action and police suits, including, but not limited to: *Sow, et al. v. City of New York, et al.*, 21-cv-00533 (S.D.N.Y.) (one of the consolidated cases in *In Re: New York City Policing During Summer 2020 Demonstrations*, largest settlement amount paid to protestors in US history); *Jones v. United States Postal Service*, 20-cv-6516 (S.D.N.Y.) (nationwide voting rights class action); *Edrei v. Bratton*, 16-cv-01652 (S.D.N.Y.), *aff'd sub. nom. Edrei v. Maguire*, 892 F.3d 525 (2d Cir. 2018) (landmark, precedential decision in challenge to NYPD's use of Long Range Acoustic Device ("LRAD") against Black Lives Matter protesters), *cert. denied Maguire v. Edrei*, 139 S. Ct. 2614 (2019) (with Gideon Oliver)); *Gallagher v. N.Y. State. Bd. of Elections*, 20-cv-5504 (S.D.N.Y.) (New York State voting rights class action). *See also Yang v. N.Y. State Bd. of Elections*, 20-cv-3325 (S.D.N.Y.), *aff'd sub.*

*nom. Yang v. Kosinski*, 960 F.3d 119 (2d Cir. 2020). C&G attorneys are also counsel on the proposed class action in *Thompson, et al. v. Hochul, et al,* 25-cv-06322 (S.D.N.Y.) and *Steadman, et al, v. City of New York, et al.*, 25-cv-04081 (E.D.N.Y.).

500.   Gideon Oliver has over 16 years of experience litigating civil rights cases against the NYPD, including hundreds of cases challenging the City's policies, practices, and customs related to protest policing. Mr. Oliver has frequently co-counseled with BLH attorneys and C&G attorneys in litigation. For example, in addition to litigating other 2004 RNC-related cases, Mr. Oliver was Of Counsel to Beldock, Levine & Hoffman attorneys at the summary judgment briefing stage of the *MacNamara* RNC 2004 class action litigation. Ever since, Mr. Oliver has always maintained a docket including at least dozens of Plaintiffs' protest-policing related cases. One such recent case was *Edrei* (with C&G). Mr. Oliver is also counsel on *Sow, et al. v. City of New York, et al.*, 21-cv-00533 (S.D.N.Y.) (one of the consolidated cases in *In Re: New York City Policing During Summer 2020 Demonstrations*, largest settlement amount paid to protestors in US history) as well as the proposed class actions in *Thompson, et al. v. Hochul, et al,* 25-cv-06322 (S.D.N.Y.) and *Steadman, et al, v. City of New York, et al.*, 25-cv-04081 (E.D.N.Y.).

501.   Jessica Massimi has 14 years of experience litigating civil rights cases against the NYPD. She has litigated a number of class action and police suits, including, but not limited to: *Sow, et al. v. City of New York, et al.*, 21-cv-00533 (S.D.N.Y.) (one of the consolidated cases in *In Re: New York City Policing During Summer 2020 Demonstrations*, largest settlement amount paid to protestors in US history); *Edrei v. Bratton*, 16-cv-01652 (S.D.N.Y.), *aff'd sub. nom. Edrei v. Maguire*, 892 F.3d 525 (2d Cir. 2018) (landmark, precedential decision in challenge to NYPD's use of Long Range Acoustic Device ("LRAD") against Black Lives Matter protesters). Ms. Massimi is also counsel on the proposed class action in *Steadman, et al, v. City of New York, et*

*al.*, 25-cv-04081 (E.D.N.Y.). Ms. Massimi has worked at a law firm representing employees in class and collective actions related to labor and employment issues, including overtime pay, off-the-clock cases, misclassification and other wage and hour matters. In many of these cases she was directly involved in briefing certification, such as in *Jibowu v. Target*, 17-cv-3875 (PKC)(CLP).

502.    Tahanie Aboushi has 15 years of experience litigating challenging the NYPD's practice and policies that violate the constitution resulting in policy changes. For example, *Elsayed, v. The City of New York, et al.,* 12-CV-5967 (S.D.N.Y.) (first individual case challenging the NYPD's removal of religious head coverings during post arrest processing) and *Elsayed, et al., v. The City of New York, et al.* 18-cv-10566 (S.D.N.Y) (a class action challenging the NYPD's removal of religious head coverings as co-counsel with BLH). Ms. Aboushi was lead counsel in *Rolon et al v. City of New York et al.,* 21-cv-02548 (S.D.N.Y) one of the consolidated cases in *In Re: New York City Policing During Summer 2020 Demonstrations*, resulting in a historic settlement with the NYPD addressing police response to first amendment activities. Ms. Aboushi is also counsel on the proposed class actions in *Thompson, et al. v. Hochul, et al,* 25-cv-06322 (S.D.N.Y.) and *Steadman, et al, v. City of New York, et al.*, 25-cv-04081 (E.D.N.Y.).

503.    BLH attorneys have litigated a number of class action lawsuits including, but not limited to: *Sow, et al. v. City of New York, et al.*, 21-cv-00533 (S.D.N.Y.) (one of the consolidated cases in *In Re: New York City Policing During Summer 2020 Demonstrations*, largest settlement amount paid to protestors in US history); *Floyd v. City of New York*, 08-cv-1034 (S.D.N.Y.) (currently in the remedial stages); *Daniels v. City of N.Y.*, 198 F.R.D. 409, 418 (S.D.N.Y. 2001) ("Aided by the capable hands of Jonathan C. Moore . . ., class counsel is undoubtedly qualified and experienced to conduct this litigation."); *MacNamara v. City of N.Y.*, 275 F.R.D. 125, 154 (S.D.N.Y. 2011); *Haus v. City of New York,* 03-cv-4915 (RWS)(MHD) 2006 WL 1148680, *1

(S.D.N.Y. April 24, 2006) (class action challenging arrests, detentions, and prosecutions of around 300 people in connection with February 15, 2003 anti-war protests); *Burley v. City of New York*, 03-cv-2915 (WHP)(FM) 2005 WL 668789 (S.D.N.Y. March 23, 2005) (class action arising from mass arrests of over 200 demonstrators during 2002 WEF in New York City); and *Mandal v. City of New York*, 02-cv-1234 (WHP)(FM) (S.D.N.Y); *Syed v. City of New York*, 16-cv-04789 (S.D.N.Y.); *Elsayed v. City of New York et al.*, 18-cv-10566 (S.D.N.Y.); and *Sughrim v. State of New York*, 19-CV-7977 (S.D.N.Y.).

504.    Yan Fu has 11 years of experience litigating civil rights police misconduct suits on behalf of both plaintiffs and defendants. Prior to becoming a plaintiff's attorney, he was an Assistant Attorney General with the Office of the New York State Attorney General. As such, he advised New York State agencies and officials regarding the defense of class action lawsuits.

505.    Sujata Gibson, founder of Gibson Law Firm, PLLC, has over 17 years of experience litigating civil rights cases, with a focus on police misconduct and protest policing. In 2016, Gibson established the Protest Defense Practicum at Cornell Law School, one of the first clinical legal education programs in the nation to focus on representing protestors. Through teaching the clinic and in her own practice, Ms. Gibson has represented thousands of protestors in criminal defense and civil suits, including recent litigation such as *Bensmaine v. City of New York*, 21-cv-04816 (S.D.N.Y.), one of the related cases coordinated with *In Re: New York City Policing During Summer 2020 Demonstrations* addressing excessive force and unlawful arrests. Her extensive docket reflects a sustained commitment to challenging systemic abuses through impactful civil rights litigation.

506. Plaintiffs' counsel's firms have the resources, expertise, and experience to prosecute this action, and know of no conflicts among members of the Class or between the attorneys and members of the Class.

507. An Injunctive Class should be certified pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure because the Defendants have acted on grounds generally applicable to the class, in engaging in the aforementioned practices and failing to correct the aforementioned unconstitutional policies thereby making class-wide declaratory and injunctive relief appropriate.

508. A Damages Class should be certified pursuant to Rule 23(b)(3) because questions of law or fact common to the members of the class predominate over any questions affecting only individual Class Members and a class action is superior to other available methods for the fair and efficient adjudication of the controversy. A class-wide proceeding will generate common answers to these questions.

## FIRST CLAIM FOR RELIEF

**Unlawful Seizure / False Arrest**
*Pursuant to 42 U.S.C. § 1983 for Defendants' Violations of Plaintiffs' Rights Under the Fourth and Fourteenth Amendments to the United States Constitution*

509. Plaintiffs incorporate by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

510. Upon information and belief, Defendants seized and arrested Plaintiffs without any judicial warrant authorizing them to seize any Plaintiff. This conduct was unreasonable, and was done without privilege or lawful justification.

511. Plaintiffs did not consent and were conscious of their confinements by Defendants.

512. Defendants did not have individualized probable cause to seize, detain, or arrest Plaintiffs.

513.    As a result of Defendants' acts and omissions, Defendants deprived Plaintiffs of their federal, state, and/or other legal rights; caused Plaintiffs bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused Plaintiffs to expend costs and expenses; and/or otherwise damaged and injured Plaintiffs.

514.    The unlawful conduct of the Defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

<u>**SECOND CLAIM FOR RELIEF**</u>

**Excessive Force**
***Pursuant to 42 U.S.C. § 1983 for Defendants' Violations of Plaintiffs' Rights Under the Fourth and Fourteenth Amendments to the United States Constitution***

515.    Plaintiffs incorporate by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

516.    Defendants' use of force against Plaintiffs was unjustified and objectively unreasonable, taking into consideration the facts and circumstances that confronted Defendants.

517.    As a result of Defendants' acts and omissions, Defendants deprived Plaintiffs of their federal, state, and/or other legal rights; caused Plaintiffs bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused Plaintiffs to expend costs and expenses; and/or otherwise damaged and injured Plaintiffs.

518.    The unlawful conduct of the Defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

## THIRD CLAIM FOR RELIEF

### First Amendment
#### *Pursuant to 42 U.S.C. § 1983 for Defendants' Violations of Plaintiffs' Rights Under the First and Fourteenth Amendments to the United States Constitution*

519.   Plaintiffs incorporate by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

520.   In committing the acts and omissions set forth herein, the Defendants acted under color of state law, individually and in concert, without lawful justification to deprive Plaintiffs of their rights to speech, expression and to assemble in violation of the First, Fifth, and Fourteenth Amendments to the United States.

521.   Defendants imposed restrictions on protected speech and/or conduct that violated Plaintiffs' First Amendment rights, including, but not limited to, in unlawfully seizing Plaintiffs, in subjecting Plaintiffs to excessive force, in subjecting Plaintiffs to Defendants' protest policing policies, and in otherwise violating Plaintiffs' rights and engaging in the acts and omissions complained of herein.

522.   The Defendants' retaliatory restrictions Plaintiffs complain of herein imposed upon Plaintiffs' First Amendment rights to participate in, observe, and/or stand nearby speech, conduct, association, and/or other expressive activities protected by the First Amendment in public were themselves regulations on Plaintiffs' protected conduct that:

   a.   Were viewpoint discriminatory and/or otherwise not content-neutral, and were not necessary, and precisely tailored, to serve compelling governmental interests, and/or were not the least restrictive means readily available to serve those interests; or,

   b.   Were content-neutral but nonetheless lacked sufficiently narrow tailoring to serve a significant governmental interest in that the restrictions substantially burdened more protected speech and/or conduct than was necessary to serve those interests, and/or failed to adequately provide alternatives for Plaintiff's protected expression, including in that Plaintiff's abilities to communicate effectively were

threatened or limited; and/or

c. Afforded Defendants unbridled or otherwise inappropriately limited discretion to limit or deny Plaintiff's abilities to engage in protected conduct (also raising constitutionally significant Due Process-based vagueness and/or overbreadth concerns); and/or

d. Amounted to the imposition of strict liability on Plaintiffs for engaging in protected speech and/or expression.

523. As a result of Defendants' acts and omissions, Defendants deprived Plaintiffs of Plaintiffs' federal, state, and/or other legal rights; caused Plaintiffs bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused Plaintiffs to expend costs and expenses; and/or otherwise damaged and injured Plaintiffs.

524. The unlawful conduct of the Defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

## FOURTH CLAIM FOR RELIEF

### First Amendment Retaliation
***Pursuant to 42 U.S.C. § 1983 for Defendants' Violations of Plaintiffs' Rights Under the First and Fourteenth Amendments to the United States Constitution***

525. Plaintiffs incorporate by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

526. Defendants retaliated against Plaintiffs for engaging in speech and/or conduct protected by the First Amendment.

527. Defendants engaged in the acts and omissions complained of herein in retaliation for Plaintiffs' protected speech and/or conduct.

528. Defendants engaged in the acts and omissions complained of herein in order to prevent Plaintiffs from continuing to engage in such protected speech and/or conduct.

529.    Defendants engaged in the acts and omissions complained of herein in order to prevent and/or discourage Plaintiffs from engaging in similar protected conduct in the future.

530.    Additionally, as discussed elsewhere herein, Defendants designed and/or implemented policies and practices pursuant to which those Defendants who implemented them subjected Plaintiffs to violations of the First Amendment rights.

531.    Upon information and belief, Defendants engaged in the acts and omissions complained of herein with respect to Plaintiffs' First Amendment-based claims—including the related municipal liability claims involving the adoption of policies, practices, and/or customs and/or related failures to train, supervise, and/or discipline—with malice.

532.    Upon information and belief, Defendants engaged in the acts and omissions complained of herein with respect to Plaintiffs' First Amendment retaliation claims—including the related municipal liability claims involving the adoption of policies, practices, and/or customs and/or related failures to train, supervise, and/or discipline—in response to the perceived viewpoint and/or message expressed by Plaintiffs.

533.    Additionally, the offenses charged against Plaintiffs, which Defendants might argue provided probable cause for Plaintiffs' arrests, were all offenses that Defendants typically exercise their discretion not to enforce, or not to make arrests in connection with.

534.    Each Plaintiff suffered actual chill in that each Plaintiff was prevented and/or deterred from or impeded in participating in protected conduct on the date of and after the incident; and/or suffered adverse effects on their protected speech and/or conduct; and/or otherwise suffered some concrete harm(s).

535.    Additionally, in many cases, Defendants apparently permitted, acquiesced in, and/or facilitated the speech and/or other expressive conduct in which Plaintiffs were engaging,

before suddenly using force and/or making arrests, without first having given reasonable notice that such force and/or arrest activity would result if Plaintiffs did not conduct themselves differently and/or disperse, as well as a meaningful opportunity to comply.

536.    Additionally, as discussed elsewhere herein, Defendants designed and/or implemented policies and practices pursuant to which those Defendants who ordered, effected, and otherwise participated in arresting and detaining Plaintiffs subjected Plaintiffs to the violations of their First Amendment rights described elsewhere herein.

537.    As a result of Defendants' acts and omissions, Defendants deprived Plaintiffs of their federal, state, and/or other legal rights; caused Plaintiffs bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused Plaintiffs to expend costs and expenses; and/or otherwise damaged and injured Plaintiffs.

538.    The unlawful conduct of the Defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

### FIFTH CLAIM FOR RELIEF

**Due Process**
***Pursuant to 42 U.S.C. § 1983 for Defendants' Violations of Plaintiffs' Rights Protected Under the Fifth and Fourteenth Amendments to the United States Constitution***

539.    Plaintiffs incorporate by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

540.    In addition to the Due Process violations described above, Defendants enforced offenses in a manner that rendered them constitutionally void for vagueness and/or overbroad, such that their enforcement against Plaintiffs violated their Due Process rights, in that Defendants' enforcement in connection with those offenses failed to provide and/or reflected the absence of adequately clear standards to guide police officials' extremely broad discretion to arrest anyone at

their whim, based on *ad hoc* determinations, often without fair warning and/or instructions on where Plaintiffs could continue engaging in their First Amendment-protected activity.

541. Additionally, as discussed elsewhere herein, Defendants designed and/or implemented policies and practices pursuant to which those Defendants who ordered, effected, and otherwise participated in seizing and/or retaining Plaintiffs' property and/or detaining Plaintiffs in the conditions as described subjected Plaintiffs to the violations of their Due Process rights described elsewhere herein.

542. As a result of Defendants' acts and omissions, Defendants deprived Plaintiffs of their federal, state, and/or other legal rights; caused Plaintiffs bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused Plaintiffs to expend costs and expenses; and/or otherwise damaged and injured Plaintiffs.

543. The unlawful conduct of the Defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

### SIXTH CLAIM FOR RELIEF

**Deprivation of Fair Trial Rights**
*Pursuant to 42 U.S.C. § 1983 for Defendants' Violations of Plaintiffs' Rights Protected Under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution*

544. Plaintiffs incorporate by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

545. Defendants fabricated evidence of a material nature, likely to influence a jury's decision, intentionally forwarded that evidence to prosecutors, as a result of which Plaintiffs suffered liberty deprivations and other injuries.

546. As a result of Defendants' acts and omissions, Defendants deprived Plaintiffs of their federal, state, and/or other legal rights; caused Plaintiffs bodily injury, pain, suffering,

psychological and/or emotional injury, and/or humiliation; caused Plaintiffs to expend costs and expenses; and/or otherwise damaged and injured Plaintiffs.

547.     The unlawful conduct of the Defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

### SEVENTH CLAIM FOR RELIEF

**Malicious Prosecution**
***Pursuant to 42 U.S.C. § 1983 for Defendants' Violations of Plaintiff's Rights Protected Under the Fourth and Fourteenth Amendments to the United States Constitution***

548.     Plaintiffs incorporate by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

549.     Defendants were directly and actively involved in the initiation or prosecution of criminal proceedings against Plaintiffs, including by supplying and creating false information to be included in police paperwork that was included in police paperwork and providing falsely sworn information in accusatory instruments.

550.     Defendants misrepresented and falsified evidence and/or failed to make a full statement of the relevant evidence – including potentially exculpatory evidence.

551.     Defendants lacked probable cause to initiate and continue criminal proceedings against Plaintiffs.

552.     Defendants acted with malice in initiating criminal proceedings against Plaintiffs.

553.     Notwithstanding Defendants' misconduct, the criminal proceedings against Plaintiffs were favorably terminated.

554.     As a result of Defendants' acts and omissions, Defendants deprived Plaintiffs of their federal, state, and/or other legal rights; caused Plaintiffs bodily injury, pain, suffering,

psychological and/or emotional injury, and/or humiliation; caused Plaintiffs to expend costs and expenses; and/or otherwise damaged and injured Plaintiffs.

555.    The unlawful conduct of the Defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

### EIGHTH CLAIM FOR RELIEF

**Equal Protection and Selective Enforcement**
***Pursuant to 42 U.S.C §1983 for Defendants' Violations of Plaintiffs' Rights Under the Fourteenth Amendments to the United States Constitution***

556.    Plaintiffs incorporate by reference all the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

557.    As discussed herein, Defendant City designed and/or implemented policies and practices pursuant to which those individual Defendants who ordered, effected, and otherwise participated in detaining Plaintiffs thus subjected Plaintiffs to the above-described violations of Plaintiffs' Equal Protection rights.[55]

558.    As a result of Defendants' acts and omissions, Defendants deprived Plaintiffs of their federal, state, and/or other legal rights; caused Plaintiffs bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused Plaintiffs to expend costs and expenses; and/or otherwise damaged and injured Plaintiffs.

559.    The unlawful conduct of the Defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

---

[55] *See* e.g. NYCLU *supra* note 20 "The continual pattern of NYPD aggression against pro-Palestine demonstrators raises important questions about the City's disparate treatment of speakers based on their message."; *See also* CAIR-NY *supra* note 19.

## NINTH CLAIM FOR RELIEF

**Municipal Liability**
*Pursuant to 42 U.S.C. 1983 and Monell v. Department of Social Services, 436 U.S. 658 (1978)
for Defendants' Violations of Plaintiffs' Rights Under the First, Fourth, and Fourteenth
Amendments to the United States Constitution*

560.    Plaintiffs hereby incorporate by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

561.    The facts pleaded above describe the policies, practices, and customs Defendants subjected the Class Representatives and other Class Members to, including, but not limited to:

    a.  Uses of excessive force, false arrests, and unreasonable restrictions on protesters' First Amendment-protected conduct, often without fair warning;

    b.  Employing crowd control tactics such as pushing, corralling, encircling, or otherwise trapping protesters, without fair warning;

    c.  Engaging in retaliatory and selective enforcement of violations against perceived participants in First Amendment assemblies, particularly Palestine-related protests, in the absence of adequately clear standards to guide police officials' extremely broad discretion to arrest anyone at their whim, based on *ad hoc* determinations as to their perceived violations, without fair warning;

    d.  Failing to loosen or remove over-tight cuffs; and

    e.  Subjecting arrestees to lengthy detentions and lengthy detentions and arrest processing at centralized arrest processing locations, exposing them to searches, property seizures, and unhealthy and conditions of confinement, in lieu of brief street detentions.

562.    All of the wrongful acts or omissions complained of herein were carried out by the individual named and unnamed police officer defendants pursuant to: (a) formal policies, rules, and procedures of the defendant municipalities; (b) actions and decisions by the defendant municipalities' policymaking agents; (c) customs, practices, and usage of the defendant municipalities that are so widespread and pervasive as to constitute *de facto* policies accepted, encouraged, condoned, ratified, sanctioned, and/or enforced by policymaking officials; (d) the

defendant municipalities' deliberate indifference to Plaintiffs' rights secured by the First, Fourth, and Fourteenth Amendments of the United States Constitution, as evidenced by defendants' failures, and the failures of the policymaking agents, to train, supervise, and discipline police officers, despite full knowledge of the officers' wrongful acts, as described herein.

563.    The policies and practices (informal or formal) challenged herein also include, without limitation:

    a.  Were viewpoint discriminatory and/or otherwise not content-neutral, and were not necessary, and precisely tailored, to serve compelling governmental interests, and/or were not the least restrictive means readily available to serve those interests; or, Charging, or arresting and charging with a different offense, people under VTL § 1156(a), despite the charge either literally or all but literally never being used except for people at protests, as part of a practice to have always-available pretextual cause to arrest people engaged in First Amendment Activity;

    b.  Using excessively tight handcuffs as a means of punishing protesters for their speech; lacking available means to loosen or remove handcuffs; leaving tight handcuffs on for hours and only ever removing them at mass arrest processing locations; allowing a culture and de facto practice of disregarding both written policy and manufacturer/medical instructions that plastic cuffs must (1) only be used on non-resisting arrestees and (2) be removed immediately after complaints of tightness; and similar disregards for the seriousness of the risks that accompany zip-tie cuffs;

    c.  Either officially sanctioning or allowing a culture to fester where command/"white-shirt" level officers attack and escalate, rather than facilitate and de-escalate, protests, and move in with maximum force, use batons to the head, punches, and other extreme uses of force routinely and for "fun"[56];

    d.  Using mass arrests as a standard response to protests, arresting protesters for group-probable cause based arrests, and the like; and

    e.  Failing/refusing to issue process on the street for specifically protest arrests.

564.    As a result of Defendants' acts and omissions, Defendants deprived Plaintiffs of their federal, state, and/or other legal rights; caused Plaintiffs bodily injury, pain, suffering,

---

[56] *See* n. 15, above.

psychological and/or emotional injury, and/or humiliation; caused Plaintiffs to expend costs and expenses; and/or otherwise damaged and injured Plaintiffs.

565.    The unlawful conduct of the Defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

## TENTH CLAIM FOR RELIEF

### Violations of the New York State Constitution

566.     Plaintiffs incorporate by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

567.    The conduct of the police officials alleged herein occurred while they were on duty and/or in and during the course and scope of their duties and functions as police officials, and/or while they were acting as agents and employees of Defendant City, clothed with and/or invoking state power and/or authority, and, as a result, Defendant City is liable to Plaintiffs pursuant to the state common law doctrine of *respondeat superior*.

568.    Defendants, acting under color of law, violated Plaintiffs' rights pursuant to Article I, §§ 3, 6, 8, 9, 11, and 12 of the New York State Constitution.

569.    A damages remedy here is necessary to effectuate the purposes of Article I, §§ 3, 6, 8, 9, 11, and 12 of the New York State Constitution, and appropriate to ensure full realizations of Plaintiffs' rights under those sections.

570.    As a result of Defendants' acts and omissions, Defendants deprived Plaintiffs of their federal, state, and/or other legal rights; caused Plaintiffs bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused Plaintiffs to expend costs and expenses; and/or otherwise damaged and injured Plaintiffs.

571.    The unlawful conduct of the Defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

## ELEVENTH CLAIM FOR RELIEF

### Violations of New York State Common Law
### *Assault*

572.    Plaintiffs incorporate by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

573.    The conduct of the police officials alleged herein occurred while they were on duty and/or in and during the course and scope of their duties and functions as police officials, and/or while they were acting as agents and employees of Defendant City, clothed with and/or invoking state power and/or authority, and, as a result, Defendant City is liable to the Plaintiffs pursuant to the state common law doctrine of *respondeat superior*.

574.    Defendants committed assault within the meaning of New York common law against Plaintiffs by intentionally placing Plaintiffs in fear of imminent harmful or offensive contact.

575.    Defendants did thereby inflict assault upon the Plaintiffs.

576.    As a result of Defendants' acts and omissions, Defendants deprived Plaintiffs of their federal, state, and/or other legal rights; caused Plaintiffs bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused Plaintiffs to expend costs and expenses; and/or otherwise damaged and injured Plaintiffs.

577.    The unlawful conduct of the Defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

## TWELFTH CLAIM FOR RELIEF

### Violations of New York State Common Law
*Battery*

578.    Plaintiffs incorporate by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

579.    The conduct of the police officials alleged herein occurred while they were on duty and/or in and during the course and scope of their duties and functions as police officials, and/or while they were acting as agents and employees of Defendant City, clothed with and/or invoking state power and/or authority, and, as a result, Defendant City is liable to the Plaintiffs pursuant to the state common law doctrine of *respondeat superior*.

580.    Defendants committed battery within the meaning of New York common law against Plaintiffs by intentionally physically contacting Plaintiffs without Plaintiffs' consent.

581.    Defendants did thereby inflict battery upon the Plaintiffs.

582.    As a result of Defendants' acts and omissions, Defendants deprived Plaintiffs of their federal, state, and/or other legal rights; caused Plaintiffs bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused Plaintiffs to expend costs and expenses; and/or otherwise damaged and injured Plaintiffs.

583.    The unlawful conduct of the Defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

## THIRTEENTH CLAIM FOR RELIEF

### Violations of New York State Common Law
*Conversion*

584.    Plaintiffs incorporate by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

585.     The conduct of the police officials alleged herein occurred while they were on duty and/or in and during the course and scope of their duties and functions as police officials, and/or while they were acting as agents and employees of Defendant City, clothed with and/or invoking state power and/or authority, and, as a result, Defendant City is liable to the Plaintiffs pursuant to the state common law doctrine of *respondeat superior*.

586.     Defendants committed conversion by intentionally taking possession of and/or interfering with Plaintiffs' personal property in derogation of Plaintiffs' rights.

587.     As a result of Defendants' acts and omissions, Defendants deprived Plaintiffs of their federal, state, and/or other legal rights; caused Plaintiffs bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused Plaintiffs to expend costs and expenses; and/or otherwise damaged and injured Plaintiffs.

588.     The unlawful conduct of the Defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

## FOURTEENTH CLAIM FOR RELIEF

### Violations of New York State Common Law
### *False Arrest, False Imprisonment, and Unreasonable Detention*

589.     Plaintiffs incorporate by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

590.     The conduct of the police officials alleged herein occurred while they were on duty and/or in and during the course and scope of their duties and functions as police officials, and/or while they were acting as agents and employees of Defendant City, clothed with and/or invoking state power and/or authority, and, as a result, Defendant City is liable to the Plaintiffs pursuant to the state common law doctrine of *respondeat superior*.

591. By the actions described above, the police officials described above did falsely arrest and/or imprison Plaintiffs within the meaning of New York common law without reasonable or probable cause, illegally and without a written warrant, and without any right or authority to do so. Plaintiffs were conscious of the confinement, and it was without their consent.

592. As a result of Defendants' acts and omissions, Defendants deprived Plaintiffs of their federal, state, and/or other legal rights; caused Plaintiffs bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused Plaintiffs to expend costs and expenses; and/or otherwise damaged and injured Plaintiffs.

593. The unlawful conduct of the Defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

### FIFTEENTH CLAIM FOR RELIEF

**Violations of New York State Common Law**
***Negligent Training and Supervision***

594. Plaintiffs incorporate by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

595. The conduct of the police officials alleged herein occurred while they were on duty and/or in and during the course and scope of their duties and functions as police officials, and/or while they were acting as agents and employees of Defendant City, clothed with and/or invoking state power and/or authority, and, as a result, Defendant City is liable to the Plaintiffs pursuant to the state common law doctrine of *respondeat superior*.

596. Upon information and belief, the defendant municipalities supervised and trained the police officials described above.

597.    The acts and conduct of the police officials were the direct and proximate cause of injury and damage to the Plaintiffs and violated their statutory and common law rights as guaranteed by the laws and Constitution of the State of New York.

598.    Defendants' acts and omissions were the direct and proximate cause of injury and damage to the Plaintiffs and violated their rights as guaranteed by the laws and Constitution of the State of New York.

599.    As a result of Defendants' acts and omissions, Defendants deprived Plaintiffs of their federal, state, and/or other legal rights; caused Plaintiffs bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused Plaintiffs to expend costs and expenses; and/or otherwise damaged and injured Plaintiffs.

600.    The unlawful conduct of the Defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

### SIXTEENTH CLAIM FOR RELIEF

**Violations of New York State Common Law**
*Excessive Detention*

601.    Plaintiffs incorporate by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

602.    The conduct of the police officials alleged herein occurred while they were on duty and/or in and during the course and scope of their duties and functions as police officials, and/or while they were acting as agents and employees of Defendant City, clothed with and/or invoking state power and/or authority, and, as a result, Defendant City is liable to the Plaintiffs pursuant to the state common law doctrine of *respondeat superior*.

603.    Defendants deliberately detained protesters for excessive and unreasonably prolonged periods of time.

604.    As a result of Defendants' acts and omissions, Defendants deprived Plaintiffs of their federal, state, and/or other legal rights; caused Plaintiffs bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused Plaintiffs to expend costs and expenses; and/or otherwise damaged and injured Plaintiffs.

605.    The unlawful conduct of the Defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them

### SEVENTEENTH CLAIM FOR RELIEF

**Violations of New York Civil Rights Law § 79-P / N.Y.C. Admin Code § 14-189 *et seq.***

606.    Plaintiffs hereby reallege and incorporate by reference all of the preceding paragraphs as though they were fully set forth herein.

607.    Prior to their assault, battery, and arrest, certain Plaintiffs were exercising their rights under New York Civil Rights Law § 79-P, the New Yorker's Right to Monitor Act, to record law enforcement activity and under the similar provisions of N.Y.C. Admin. C. § 14-189, Right to Record Police Activities.

608.    In assaulting and arresting Plaintiffs, Defendants exceeded their authority because their conduct was inconsistent with New York Civil Rights Law § 79-P, N.Y.C. Admin. C. § 14-189, and the Federal Constitution.

609.    Defendants violated New York Civil Rights Law § 79-P in that they violated Plaintiffs' rights while Plaintiffs "exercised or attempted to exercise the right established in subdivision two of this section to record a law enforcement activity and an officer acted to interfere with that person's recording of a law enforcement activity" in one of the specified ways.

610.    Defendants violated N.Y.C. Admin. C. § 14-189 for substantially the same reason.

611.     Defendants unlawfully arrested Plaintiffs to deter them from exercising their right to record law enforcement activity.

612.     New York Civil Rights Law § 79-P and N.Y.C. Admin. C. § 14-189 create private rights of action that explicitly provides for punitive damages and injunctive relief, as well as mandatory attorneys' fees and expert fees.

613.     New York Civil Rights Law § 79-P and N.Y.C. Admin. C. § 14-189 define "record" and the related right in extremely broad terms.

614.     Specifically, the laws create rights of action to sue for any law enforcement interference with the right, including "attempting to prevent [a] person from recording law enforcement activity."  New York Civil Rights Law § 79-P(3)(i); *see also*, *id* § (iv); and N.Y.C. Admin. C. § 14-189(c).

615.     Similarly, there is a cause of action where an officer — regardless of the fact of recording — engages in "commanding that the person cease recording law enforcement activity when the person was nevertheless authorized under law to record, as happened here.  New York Civil Rights Law § 79-P(3)(iii).

616.     Thus, the statutes create rights of action, and that right — like the similar First Amendment right — "do[] not depend on whether [a plaintiff's] attempt to videotape was frustrated" (*Gericke v. Begin*, 753 F.3d 1, 3 n.2 (1st Cir. 2014)), or for that matter, only intended to create the impression someone was recording.

617.     Defendants' actions and policies alike violate New York Civil Rights Law § 79-P and N.Y.C. Admin. C. § 14-189 such that all the remedies available thereunder are appropriate.

## EIGHTEENTH CLAIM FOR RELIEF

### N.Y.C. Admin. C. §§8-801 *et seq.*, "Qualified Immunity Repeal" Claims Against All Defendants

618. Plaintiffs incorporate by reference all the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

619. The New York City Administrative Code § 8-803 provides as follows in relevant part:

    a. "A covered individual who, under color of any law, ordinance, rule, regulation, custom or usage, subjects or causes to be subjected, including through failure to intervene, any other natural person to the deprivation of any right that is created, granted or protected by section 8-802 is liable to the person aggrieved for legal or equitable relief or any other appropriate relief."

    b. "The employer of a covered individual who, under color of any law, ordinance, rule, regulation, custom or usage, subjects or causes to be subjected, including through failure to intervene, any other natural person to the deprivation of any right that is created, granted or protected by section 8-802 is liable, based upon the conduct of such covered individual, to the person aggrieved for legal or equitable relief or any other appropriate relief."

    c. "A person aggrieved may make a claim pursuant to subdivision a of this section in a civil action in any court of competent jurisdiction by filing a complaint setting forth facts pertaining to the deprivation of any right created, granted or protected by section 8-802 and requesting such relief as such person aggrieved considers necessary to insure the full enjoyment of such right."

620. Given the fact that a "covered individual" under §8-801 means "[any] employee of the police department," the individual Defendants are all considered covered individuals. §8-801.

621. Plaintiffs and the Class are all "person[s] aggrieved" because they were (at minimum) "allegedly subjected to, or allegedly caused to be subjected to, he deprivation of a right created, granted, or protected by §8-802 by a covered individual even if the only injury allegedly suffered by such natural person is the deprivation of such right." *Id.*

622. Defendant City is liable as an employer, as set out above.

623. Defendants' uses of force against Plaintiffs were unjustified, unlawful, and

objectively unreasonable, considering the facts and circumstances before the Defendants.

624.    As a result of Defendants' acts and omissions, Defendants deprived Plaintiffs of Plaintiffs' federal, state, and/or other legal rights; caused Plaintiffs bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused Plaintiffs to expend costs and expenses; and/or otherwise damaged and injured Plaintiffs.

625.    Further, it is not a defense to liability under §§8-801 *et seq.* that a covered individual has qualified immunity or any other substantially equivalent immunity.

626.    Thus, the Court should award both compensatory and punitive damages against all parties (including Defendant City), an order restraining future conduct, and all reasonable fees and court expenses pursuant to §8-805 of the Administrative Code.

### DEMANDS FOR RELIEF

**WHEREFORE**, Plaintiffs demand relief against the individual Defendants and the City of New York as follows:

a.  Enter an order certifying this action as a class action pursuant to Rule 23(b)(2) and (b)(3) of the Federal Rules of Civil Procedure in the manner described above herein, with Plaintiffs MONÉ MAKKAWI, ROHAAN GILL, LOAY ELASMAR, MIGUEL FIGUEROA, AHMED ELSAYED, ARIB HASAN, CARLA TEJADA, BENJAMIN WILSON, ETHAN WRIGHT, MALIK SALTI, and BRYAN VIVAS as Class Representatives;

b.  Issue a class-wide declaratory judgment;

c.  Issue a permanent injunction enjoining Defendants from violently disrupting protests;

d.  Issue a permanent injunction enjoining Defendants from engaging in the conduct described herein;

e.  Retain jurisdiction in this case until the unlawful conditions, practice, policies, acts and omissions complained of herein no longer exist and this Court is satisfied that they will not recur;

f.   Award Plaintiffs compensatory and punitive damages in amounts that are fair, just, and reasonable, to be determined at trial;

g.   Award Plaintiffs, and the members of the class, reasonable attorneys' fees and costs; and

h.   Grant such other and further relief as this Court may deem appropriate and equitable, including injunctive and declaratory relief as may be required in the interests of justice.

**[Signatures on Following Page]**

95

Dated: August 11, 2025
       Queens, NY

**COHEN&GREEN PLLC**

By:    Elena L. Cohen
        J. Remy Green
        Regina J. Yu
        Leena M. Widdi
1639 Centre Street, Suite 216
Ridgewood (Queens), NY 11385
t: (929) 888-9480
elena@femmelaw.com
protests@femmelaw.com

**GIDEON ORION OLIVER**

277 Broadway, Suite 1501
New York, NY 10007
t: (718) 783-3682
Gideon@GideonLaw.com

**THE FU FIRM PLLC**

By: Yan Fu
43 West 43rd Street, Suite 205
New York, NY 10036
t: (212) 584-0581
yfu@thefufirm.com

**MASSIMI LAW PLLC**

By: Jessica Massimi
99 Wall Street, Suite 1264
New York, NY 10005
t: (646) 241-9800
jessica.massimi@gmail.com

**THE ABOUSHI LAW FIRM PLLC**

By: Tahanie A. Aboushi
1441 Broadway, 5th Floor
New York, NY 10018
t: (212) 391-8500
tahanie@aboushi.com

**BELDOCK LEVINE & HOFFMAN LLP**

By:    David B. Rankin
        Luna Droubi
99 Park Avenue, PH/26th Floor
New York, NY 10016
t: (212) 277-5825
drankin@blhny.com

**GIBSON LAW FIRM PLLC**

/s/

By: Sujata S. Gibson
120 E Buffalo St., Suite 2
Ithaca, NY 14850
sujata@gibsonfirm.law
t: (607) 327-425